UNITED STATES DISTRICT COURT FILED
DISTRICT OF CONNECTICUT

2004 JAN -5 P 2: 13

| | | |
|---|---|---|
| TERESA TRAINOR | : | CIVIL ACTION NO: 3:02CV1230 (AWT) |
| *Plaintiff* | : | HARTFORD, CT. |
| | : | |
| | : | |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT | : | |
| DEPARTMENT OF CORRECTION | : | |
| *Defendant* | : | JANUARY 5, 2004 |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

The plaintiff Teresa Trainor, ("plaintiff" or "Trainor") instituted this action based on

Title VII against her employer, the Connecticut Department of Correction ("DOC").

Citing two incidents involving her co-workers, and a paragraph in an anonymous,

underground newsletter, plaintiff contends that DOC permitted a unlawful hostile work

environment based on her gender. Plaintiff cannot bear her burden of proving a severe

and pervasively abusive working environment, as the incidents were neither pervasive

nor extreme enough to change her conditions of employment. DOC has an established

complaint procedure and promptly and properly responded to the incidents that were

reported. Thus, the co-worker conduct and the anonymous newsletter cannot be

imputed to DOC. The defendant DOC respectfully requests judgment in its favor as a

matter of law.

## II.    FACTS

The plaintiff, Teresa Trainor ("plaintiff" or "Trainor"), has been employed as a correctional officer by the defendant State of Connecticut Department of Correction ("DOC") since August 1994.  Statement of Material Facts Not in Dispute ("SMF") ¶ 1. From immediately after her academy training in 1994 through early October 2001, plaintiff worked at the Hartford Correctional Center ("HCC") as a correctional officer. SMF ¶ 2.  From February 2000 to June 2002, Peter J. Murphy was the warden of HCC (hereinafter "Warden Murphy").  SMF ¶ 3.  At that time, John Armstrong was the Commissioner of Correction (hereinafter "Commissioner Armstrong").  Id.

On or about October 4, 2001, plaintiff volunteered for and participated in a hostage training simulation.  SMF ¶ 4.  The training simulation was witnessed by an outside civilian, who reported it to the Connecticut State Police and the Hartford Police Department.  Id.  The outside police departments responded to the report as though it was a real hostage situation.  Id.  Immediately after the October 4, 2001 simulation, plaintiff left Hartford Correctional Center and shortly thereafter filed for workers' compensation for a back or shoulder injury.  SMF ¶ 5.  She remained out on workers' compensation for six (6) months.  Id.

On October 9, 2001, plaintiff requested a transfer to a different correctional facility.  SMF ¶ 6.  Plaintiff requested the transfer because of the simulation, not because of any of the allegations underlying this litigation.  Id.  The transfer request was granted on October 24, 2001, and accepted by plaintiff on October 26, 2001.  Id.  Thus, plaintiff never returned to work at HCC after the October 4, 2001 hostage training simulation.  Id.  By approving the transfer request, DOC permitted plaintiff to bump other employees who had more time on the transfer list for that particular facility.  Id.

2

On or about October 24, 2001, an underground newsletter was found in the correctional staff's dining area at HCC. SMF ¶ 7. This area is accessible to correctional staff with only limited, supervised access by inmates. Id. The underground newsletter was specific to HCC and contained offensive and inappropriate racial and sexual statements regarding HCC captains, lieutenants, and correctional officers, both men and women. SMF ¶ 8.

When Warden Murphy was first appointed to HCC in early 2000, there had been two other underground newsletters at HCC, the first within a week of his arrival, and the second within a few weeks thereafter. SMF ¶ 9. At that time, Warden Murphy ordered all copies gathered and shredded, and was unable to ascertain who had written, published or disseminated the underground newsletters. Id.

Compared to the 2000 underground newsletters, the October 2001 underground newsletter was remarkable for its even more extreme views and the virulence of its personal attacks. SMF ¶ 10. The October 2001 underground newsletter contained an inappropriate paragraph about the plaintiff being out on workers' compensation. SMF ¶ 11.

The underground newsletter was anonymously written. Plaintiff does not know who wrote it, and concedes that it is possible that the newsletter was written by a correctional officer (*i.e.* a co-worker). SMF ¶ 12. Plaintiff heard rumors about who wrote it but she never shared those rumors with either DOC or the Commission on Human Rights and Opportunities. Id. The DOC management does not know who wrote the underground newsletter. SMF ¶ 13. Plaintiff has no reason to believe that either Warden Murphy or Commissioner Armstrong had any role in the writing, publishing or

3

dissemination of the underground newsletter. SMF ¶ 14. Warden Murphy had no role in the writing, publishing or dissemination of the underground newsletter. SMF ¶ 15.[1]

The plaintiff does not know how the underground newsletter was published or disseminated. SMF ¶ 16. She concedes that a correctional staff member could have brought the underground newsletter into the facility in their pocket or training folder. Id. DOC and Murphy do not know how the underground newsletter was published or disseminated. SMF ¶ 17. Warden Murphy assumes that a correctional staff member brought it into the facility in his or her pocket or lunch. Id.

In the third week of October 2001, the plaintiff received a copy of the underground newsletter at home. SMF ¶ 18. The envelope was handwritten, but the plaintiff threw the envelope away. Id. Plaintiff has no reason to believe that either Warden Murphy or Commissioner Armstrong had any role in mailing the underground newsletter to her house. SMF ¶ 19. Warden Murphy did not send the underground newsletter to plaintiff, nor does he know who did. Id.

Shortly after the underground newsletter was found, Commissioner Armstrong, was holding his monthly "Commissioner's Meeting", where all of the wardens, deputy commissioners and top administrative staff of the DOC would meet with and report to the Commissioner. SMF ¶ 21. Warden Murphy brought the underground newsletter to the Commissioner's Meeting. SMF ¶ 22. Upon seeing the underground newsletter, Commissioner Armstrong immediately brought it before the assembled group, denounced it and similar newsletters that periodically appeared at other facilities. Id.

---

[1]    At the time of the submission of this motion, former Commissioner Armstrong is serving in Iraq and thus is unavailable to submit evidence. Like the plaintiff, DOC has no reason to believe that Commissioner Armstrong had any role in the underground newsletter.

Commissioner Armstrong instructed the group to address the underground newsletter issue wherever it appeared, and informed them that he would contact and work with the union to address the underground newsletter problem. Id.

The next weekday after the Commissioner's meeting, Warden Murphy attended roll call at HCC. SMF ¶ 23. During roll call, Warden Murphy denounced the underground newsletter, and warned HCC correctional staff that whomever had written the underground newsletter would face employment consequences, and due to the offensive and inappropriate nature of the underground newsletter, might face civil consequences as well. Id. Warden Murphy requested that anyone who had any facts regarding the underground newsletter to come forward with that information. Id.

Warden Murphy also directed his staff to gather any and all copies of the underground newsletter and to shred all copies. SMF ¶ 24. No one came forward with any information regarding the underground newsletter, and Warden Murphy was unable to ascertain who had written or disseminated the underground newsletter. SMF ¶ 25.

Thus, on October 30, 2001, Warden Murphy requested the Director of DOC's Central Intelligence Unit, James Huckabey, to investigate who wrote and disseminated the underground newsletter. SMF ¶ 26. The Central Intelligence Unit conducted its investigation in early November 2001. SMF ¶ 27. The unit interviewed the captains and lieutenants on duty, as well as some correctional officers, but was unable to ascertain who wrote or distributed the underground newsletter. Id.

Commissioner Armstrong also wrote a letter to the union, condemning the contents of the letter and asking for the union's assistance in the matter. SMF ¶ 28. The union never provided any information as to who was responsible for the

anonymous newsletter. SMF ¶ 29. Plaintiff had no idea as to how DOC should eradicate underground newsletters. SMF ¶ 30.

DOC has a widely published sexual harassment reporting policy and procedure. SMF ¶ 31. From the time she was hired by DOC, Plaintiff was aware of the DOC administrative directive on sexual harassment. SMF ¶ 32. Plaintiff had received affirmative action and diversity training at DOC. SMF ¶ 33. Plaintiff was aware that there was an affirmative action office at DOC. SMF ¶ 34. Plaintiff was aware that there was a process and procedure in place to make affirmative action complaints. SMF ¶ 35.

Plaintiff did not contact or report to DOC anything about the underground newsletter until she filed her complaint with the Commission on Human Rights and Opportunities ("CHRO") on or about December 6, 2001. SMF ¶ 20.

Warden Murphy never received a sexual harassment report regarding plaintiff or from plaintiff until she filed her complaint with the Commission on Human Rights and Opportunities in December 2001. SMF ¶ 37. The DOC sexual harassment reporting policy permits a report of sexual harassment to be made to a supervisor, the Unit Administrator (for HCC, Warden Murphy), the Affirmative Action Unit or the Commissioner. SMF ¶ 36. If a report regarding sexual harassment at HCC was made to either a supervisor or the Affirmative Action Unit, Warden Murphy would have been informed. Id.

Plaintiff contends that one of her co-workers, Correctional Officer ("CO") Marion Baker, approached her sometime in early 2001, and indicated that he wanted to insert his night stick into her vagina. SMF ¶ 38. She alleges that at some time before the

night stick comment, Baker told her he wanted to know what it was like to sleep with a white girl. Id.

CO Baker had no supervisory authority over plaintiff. SMF ¶ 41. Based on her training on sexual harassment and on employee conduct, plaintiff was trained to file an incident report for incidents of the magnitude of the Baker situation, but she did not do it. SMF ¶ 39. She also did not report them to the affirmative action office. Id.

Plaintiff contends that she complained orally about comments made by CO Baker to her supervisor Captain Todd Case. SMF ¶ 40. Plaintiff wanted the issue with CO Baker to be resolved informally, and for the conduct to stop. Id. Apparently the conduct did cease, for after the "night stick" comment, plaintiff had several other conversations with CO Baker without incident. SMF ¶ 42. The "night stick" comment was the only such comment plaintiff heard from CO Baker. SMF ¶ 43. Since 2001, plaintiff has had no further contact with CO Baker. SMF ¶ 44.

Plaintiff also contends that one of her co-workers, CO James Waterman, approached her in the fall of 2001, and brushed his hands across her knees, indicating that she had dirty knees from kneeling while performing sexual acts. SMF ¶ 45. The "dirty knees" comment was the only such comment plaintiff heard from CO Waterman. SMF ¶ 46. CO Waterman had no supervisory authority over plaintiff. SMF ¶ 47. Plaintiff never brought the incident with Waterman to anyone's attention. SMF ¶ 48. Since 2001, plaintiff has had no further contact with CO Waterman. SMF ¶ 49.

Plaintiff never made complaints about her supervisors. SMF ¶ 50. Her lawsuit is about her two co-workers and the underground newsletter. Id.

### III.    SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, this Court should grant summary judgment when "there is no genuine issue as to any material fact...and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In cases such as this, where the movant is the defendant, that party must demonstrate that the nonmoving party, the plaintiff, lacks evidence to support an essential element of her claim. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The movant's burden is "discharged by showing - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Id.

Once the movant has met this initial burden, the opposing party must present evidence establishing a material issue of fact. Celotex, 477 U.S. at 325.  The nonmoving party must go "beyond the pleadings" and present evidence designating "specific facts showing that there is a genuine issue for trial." Id. at 324.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

To grant a motion for summary judgment in favor of the defendant, the court does not need to find that there is literally no evidence in favor of the plaintiff.  "The judge's inquiry...unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict - 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party...upon whom the onus of proof is imposed.'" Liberty Lobby, 477 U.S. at 252.

Thus, an issue is not genuine if it is unsupported by evidence or is created by evidence that is "merely colorable" or "not significantly probative." Liberty Lobby, 477 U.S. at 250. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252. A fact is not material unless it is, under controlling substantive law, an essential element of the nonmoving party's case with respect to which he has the burden of proof at trial. Id. at 248. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every essential element of his case so as to create a genuine issue for trial. Celotex, 477 U.S. at 323; Larkin v. Town of West Hartford, 891 F. Supp. 719, 723 (D. Conn. 1995), quoting Celotex.

## IV.    ARGUMENT

A claim that an employee is being required to work in a hostile work environment is actionable under Title VII "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citations and internal quotations marks omitted). [W]hether an environment is 'hostile' or 'abusive can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) ("We have made it clear that conduct must be extreme to amount

9

to a change in the terms and conditions of employment."). These factors must be evaluated from both a subjective and objective viewpoint. Thus, the environment must be one that a reasonable person would find hostile or abusive, and the plaintiff must have subjectively believed the environment to be hostile or abusive. Harris, *supra*, U.S. 510 at 21-22.

For a hostile environment claim based upon the conduct of co-workers, in order to "survive a motion for summary judgment, a plaintiff claiming he or she was the victim of an unlawful hostile work environment must elicit evidence from which a reasonable trier of fact could conclude '(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003), *cert. denied*, 124 S.Ct. 562 (2003), *citing* Richardson v. New York State Dep't of Correctional Service, 180 F.3d 426, 436 (2d Cir. 1999). Although an employer is generally automatically liable for harassing employee conduct by an immediate or direct supervisor, with respect to **co-worker actions**, an employer is liable only if it is "negligent", that is, if it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir. 2001).[2]

---

[2]    For a hostile work environment claim by a supervisor that does not culminate in a "tangible employment action," the employer may plead the affirmative defense that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and that the plaintiff employee "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). *See*

Here, plaintiff contends that two co-workers made inappropriate comments to her, each on only one occasion. Amended complaint ¶¶ 9; SMF ¶¶ 38, 45, 50. Plaintiff further relies upon the inappropriate paragraph about her in the underground newsletter, with anonymous authorship. Amended complaint ¶¶ 11; SMF ¶ 11. These three isolated incidents cannot support a finding of a hostile work environment. Moreover, plaintiff cannot input the conduct of her co-workers to her employer, for once informed about the conduct DOC took appropriate steps to address the conduct. DOC is entitled to summary judgment on plaintiff's hostile work environment claims.

### A.    Plaintiff Cannot Establish that HCC was a Hostile Work Environment.

In the context of a summary judgment motion, a plaintiff's burden to establish a "hostile workplace" is not onerous, but it is definite. Richardson, *supra*, 180 F.3d at 439. "As a general matter, isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998) (internal quotations omitted). There is no "magic number" of harassing incidents that serves as a threshold for liability. Richardson, *supra*, 180 F.3d at 439; Alfano v. Costello, 294 F.3d 365, 379 (2d Cir. 2002). "The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief." Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62-63 (2d Cir. 1992). The conduct must be "'more than episodic; [it] must be sufficiently continuous and concerted in order to be deemed pervasive.'" Holtz v.

---

also Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003), *cert. denied*, 124 S.Ct. 562 (2003) (case turned on whether harasser was a supervisor, and standards for supervisor liability). Here, plaintiff did not suffer any tangible employment action, nor does she allege sexual harassment by a supervisor.

11

Rockefeller & Co, 258 F.3d 62, 75 (2d Cir. 2001). *citing*, Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d. Cir. 1997). "Conduct that is not severe or pervasive enough to create an objectively hostile . . . environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." Harris, *supra*, 510 U.S. at 21.

The analysis is based upon a totality of all the circumstances. Harris, *supra*, 510 U.S. at 21. "A non-exclusive list of factors relevant in determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a claim under Title VII … include (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." Richardson, *supra*, 180 F.3d at 437, *citing* Harris, *supra*, 510 U.S. at 23; Alfano v. Costello, *supra*, 294 F.3d at 379-380.

In the instant case, plaintiff's reliance on two isolated comments by co-workers, and one underground newsletter fall far short of the threshold necessary to establish a hostile work environment.   None of the three incidents involved a supervisor; none interfered with her work, none occurred "in concert" nor with any "regularity", much less a "pervasive" regularity and none changed the terms and conditions of her employment.

Indeed, Second Circuit cases with similar or more egregious facts have been held to be insufficient as a matter of law to alter the terms and conditions of employment required to maintain a hostile work environment claim. *See* Alfano v. Costello, *supra*, 294 F.3d at 379-380 (overturned jury verdict for plaintiff on hostile work environment claim, finding, as a matter of law, that five incidents over a four-year period were "too few, too separate in time, and too mild, … to create an abusive working environment,"

where female correctional officer was told she ate carrots, bananas and hot dogs in a suggestive manner, had suggestively arranged potatoes and carrot placed in her mailbox, and received two anonymous flyers with vulgar and sexual overtones); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998) (affirmed dismissal of hostile work environment claim, holding that deliberately touching an employee's breast on one occasion and telling her that she had the "sleekest ass" in the office on another occasion did not create a hostile work environment because these incidents were not sufficiently severe or pervasive to alter the plaintiff's conditions of employment); Shabat v. Blue Cross Blue Shield, 925 F. Supp. 977, 983 (W.D.N.Y. 1996), aff'd, 108 F.3d 1370 (2d Cir. 1997) (nine incidents perceived by the plaintiff as evidence of anti-Semitic animus over three and a half years, coupled with several incidents that were not objectively hostile but merely were construed as such by the plaintiff, did not support a hostile work environment claim based on religion or national origin).

Likewise, other circuits have rejected allegations as few and isolated as these presented here as insufficient as a matter of law to maintain a hostile work environment claim. See Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 354 (5th Cir. 2001) (affirmed grant of summary judgment for employer, holding eight incidents of alleged racial harassment in a twenty-five-month period insufficient to establish on hostile work environment claim); Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 872-75 (5th Cir. 1999) (affirmed summary judgment for employer, finding the type of comments and frequency were too mild to support a hostile work environment claim when, in a two-year period, co-worker made impertinent and intimate observations about plaintiff's anatomy, attempted to look down her shirt, and touched her multiple times); Mendoza v.

13

Borden, Inc., 195 F.3d 1238, 1248-49 (11th Cir. 1999) (affirmed district court's reversal of jury verdict and entry of judgment as a matter of law for employer, when in an eleven-month period, her supervisor once made inappropriate physical contact, made one arguably offensive statement, and several times made disgusting noises while staring impertinently), *cert. denied*, 529 U.S. 1068 (2000).  Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1261-63 (10th Cir. 1998) affirmed summary judgment for employer for the incidents were too few and/or between to be considered sufficiently severe or pervasive when in a three-year period, supervisor made remarks concerning plaintiff's bra strap, her underclothing, and whether she had sexual dreams; had a few incidents of unwanted touching; claimed sexual conquest of another woman employee; made pornographic architectural analogies; and took the plaintiff to a Hooter's restaurant on business travel (six total incidents)); Black v. Zaring Homes, Inc., 104 F.3d 822, 823-24 (6th Cir. 1997) (reversed jury verdict for plaintiff, finding that as on objective standard, hostile work environment not established as a matter of law, when in a four-month period, plaintiff's supervisors and co-workers made repeated sexual jokes, and at least five other sexually offensive remarks); Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1365-66 (10th Cir. 1997) (affirmed summary judgment for employer when in a sixteen-month period, supervisor made five sexually offensive statements, including one while he had his arm around the plaintiff and was peering down her dress during her wedding); Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-31 (7th Cir. 1995) (reversed jury verdict for plaintiff, finding that as on objective standard, hostile work environment not established as a matter of law, when in a seven-month period, supervisor had nine sexually offensive incidents, including repeated references to

14

plaintiff as a "pretty girl," grunting noises when she wore leather skirt, and one episode of simulated masturbation). *See also* Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753-54 (4th Cir. 1996) (affirmed summary judgment for employer); Adusumilli v. City of Chicago, 164 F.3d 353, 361-62 (7th Cir. 1998)(same).

The plaintiff here relies on only three incidents during her seven year tenure at HCC, the last of which occurred after she left the facility. She alleges that her co-worker, CO Baker, made two inappropriate comments some time in early 2001. Plaintiff subsequently had several other conversations with Baker without incident, and has had no contact with him since 2001. SMF ¶¶ 42-44. In the fall of 2001, plaintiff alleges that another co-worker, CO Waterman, made a single, inappropriate comment. SMF ¶¶ 45-46. She like wise had no contact with Waterman since 2001. SMF ¶ 49. On October 4, 2001, plaintiff left HCC on worker's compensation after the hostage training simulation and never returned to work at HCC. SMF ¶ 56. Almost three weeks later, the underground newsletter appeared at HCC. SMF ¶ 7. Thus, plaintiff was not even working at HCC when the underground newsletter appeared.

Plaintiff's claims echo the correctional officer's claims that were presented, and rejected as a matter of law, by the Second Circuit in their 2002 decision in Alfano. Like plaintiff here, the Alfano plaintiff was a female correctional officer who was the subject of anonymous inappropriate flyers, and inappropriate comments. Reversing a jury verdict in her favor, the Second Circuit found, that plaintiff's claims were, "too few, too separate in time and too mild" to "create an abusive working environment." Alfano, 294 F.3d at 379-380. Like the Second Circuit in Alfano, this Court should likewise find, as a matter

15

of law, the plaintiff's allegations fall far short of the requisite severity and regularity to establish a hostile work environment under Title VII.

**B.    THERE IS NO BASIS FOR INPUTING THE THREE INCIDENTS TO DOC.**

The second element of a Title VII hostile work environment claim based upon the conduct of co-workers requires that the plaintiff demonstrate that the conduct in question may be fairly imputed to the employer. "Liability will be imputed to the employer 'only if it is negligent, that is, if it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir. 2001). The analysis requires that harassment occurred with respect to "terms, conditions, or privileges" of employment, ... though [the plaintiff] need not show that [she] lost any tangible job benefits as a result thereof." Murray v. New York University College of Dentistry, 57 F.3d 243, 249 (2d Cir. 1995) (affirmed dismissal of hostile work environment complaint).

Here, it is beyond purview that DOC provided reasonable avenue for complaint. DOC has a widely published policy. SMF ¶ 31. Plaintiff was aware of the policy, had received training, knew there was an affirmative action office and was aware that there was a process and procedure in place to make affirmative action complaints. SMF ¶¶ 32-35. It is also clear that plaintiff failed to use the procedure. Plaintiff was trained to file an incident report for incidents the magnitude of the Baker situation, but she failed to do so. SMF ¶ 39. Plaintiff never brought the Waterman incident to anyone's attention SMF ¶ 48. Plaintiff did not raise any concerns regarding the underground newsletter until she filed with CHRO. SMF ¶ 20. Under the DOC sexual harassment reporting policy, any report of sexual harassment at HCC would have been conveyed to its

16

Warden, Warden Murphy. SMF ¶ 36. Warden Murphy never received a sexual harassment report regarding plaintiff or from plaintiff until she filed her CHRO complaint. SMF ¶ 37. The only incident report filed by plaintiff in the fall of 2001 concerned her application for worker's compensation benefits due to the October 4, 2001 hostage simulation. Id.

Even without plaintiff's formal (or informal) reports, the situations with her two co-workers were resolved. The situation with CO Baker ceased, and despite several subsequent conversations, plaintiff had no further incidents with him. SMF ¶¶ 40-44. Likewise, her incident with CO Waterman was an isolated, single instance. SMF ¶¶ 45, 46.

Long before it had notice of plaintiff's complaint, DOC responded quickly and appropriately to the offensive underground newsletter found the early morning of October 24, 2001. The Warden brought it to the attention of the Commissioner and all senior staff. SMF ¶ 23. The Commissioner immediately denounced it, and the Warden likewise denounced it at the next week day roll call. SMF ¶ 23. The Warden ordered his staff to gather and shred all copies and asked all staff for information regarding who wrote the newsletter. SMF ¶ 24. When no one stepped forward, the Warden asked the Central Intelligence Unit to investigate. SMF ¶ 25-26. The Unit interviewed HCC correctional staff within two weeks of the appearance of the underground newsletter. SMF ¶ 27. The Commissioner even asked the union for help. SMF ¶ 28. Nonetheless, despite these efforts, neither the Warden, the Central Intelligence Unit nor the Union was able to ascertain who was responsible for the underground newsletter. SMF ¶¶ 25,

27, 29. Plaintiff offered no suggestions as to how to eradicate underground newsletters (SMF ¶ 30).

The Second Circuit has recognized that anonymous harassment is "difficult for an employer to remedy." Alfano, 294 F.3d at 379-80. Likewise, in Gibson v. Crucible Materials Corp., 2003 U.S. Dist. LEXIS 19990 (N.D.N.Y. November 7, 2003), the court held that co-worker conduct would not be imputed to the employer, where an unknown individual periodically posted sexually derogatory comments about her on the walls of the men's bathrooms, and where there were numerous instances of pornographic materials around the mill. Upon being informed of the conduct, in each instance the employer properly responded to the complaint, by painting over the bathroom walls, and performing sweeps for the pornographic materials.

Finally, with respect to the underground newsletter, it contained two pages with 19 different "paragraphs", of which plaintiff was mentioned in only one. It was inappropriate and offensive across rank, gender, and national origin lines. See generally Exhibit 2. "The fact that both male and female employees are treated similarly, if badly, does give rise to the inference that their mistreatment shared a common cause that was unrelated to their sex. . . . And this inference is not necessarily eliminated even if some of the harassment has sexual content." Brown v. Henderson, 257 F.3d 246, 254 (2d Cir. 2001). Thus, in Brown, a post office union steward was subjected to a campaign of harassment by her co-workers after a bitterly contested union election. The harassment included campaigns of rumor and slander, including a rumor of an affair between her and a married co-worker, anonymous graphic caricatures of her and the married co-worker, and a vulgar picture of her drawn in a men's

18

bathroom. 257 F.3d at 249-250. The Second Circuit affirmed the grant of summary judgment for the postal service, holding that although "there is no *per se* bar to maintaining a claim of sex discrimination where a person of another sex has been similarly treated," on the facts in her case, the plaintiff could no show that she was discriminated because of her sex. 257 F.3d at 256.

Here, DOC had a well-established complaint procedure, which plaintiff ignored. Nonetheless, the situations with plaintiff's two co-workers resolved without further incident. Moreover, DOC promptly responded to the inappropriate underground newsletter. There is no factual or legal basis for holding DOC liable for these three isolated incidents.

## V.    CONCLUSION

For all of the foregoing reasons, the defendant is entitled to summary judgment as a matter of law.

DEFENDANT
STATE OF CONNECTICUT
DEPARTMENT OF CORRECTION

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____
Jane B. Emons
Assistant Attorney General
Federal Bar No. ct16515
55 Elm Street, P.O. Box 120
Hartford, CT  06141-0120
Tel: (860) 808-5340
Fax: (860) 808-5383
Jane.Emons@po.state.ct.us

## CERTIFICATION

I hereby certify that a true and accurate copy of the foregoing Memorandum in Support of Motion for Summary Judgment was served in accordance with Rule 5(b) of the Federal Rules of Civil Procedure by first-class mail, postage prepaid, on this 5th day of January, 2004 to:

William H. Paetzold, Esq.
Moriarty & Paetzold, LLC
140 Hebron Avenue, Suite 102
Glastonbury, CT 06033

Kevin A. Randolph, Esq.
15 Mountford Street
Hartford, CT 06114

Jane B. Emons
Assistant Attorney General