UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TERESA TRAINOR<br>*Plaintiff* | : | CIVIL ACTION NO.  3:02CV1230 (AWT) |
| | : | |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT<br>DEPARTMENT OF CORRECTION<br>*Defendant* | :<br>:<br>: | JANUARY 2, 2004 |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Local Rule 56(a)(1), the following material facts are not in dispute for the purpose of ruling on the present motion for summary judgment.

1. The plaintiff, Teresa Trainor ("plaintiff" or "Trainor"), has been employed as a correctional officer by the defendant State of Connecticut Department of Correction ("DOC") since August 1994. Amended complaint ¶ 7; Trainor dep. 10.[1]

2. From immediately after her academy training in 1994 through early October 2001, plaintiff worked at the Hartford Correctional Center ("HCC") as a correctional officer. Amended complaint ¶ 7; Trainor dep. 11.

3. From February 2000 to June 2002, Peter J. Murphy was the warden of HCC. Affidavit of Peter J. Murphy ¶ 1. At that time, John Armstrong was the Commissioner of Correction. Id.

---

[1] Pertinent excerpts of the plaintiff's deposition are attached hereto behind Tab A. Documentary exhibits, in numerical order, accompany the Affidavit of Peter J. Murphy, are located at Tab B. Excerpts from plaintiff's written discovery responses are located at Tab C.

1

4. On or about October 4, 2001, plaintiff volunteered for and participated in a hostage training simulation. Trainor dep. 17; Murphy Affidavit ¶ 2. The training simulation was witnessed by an outside civilian, who reported it to the Connecticut State Police and the Hartford Police Department. Id. The outside police departments responded to the report as though it was a real hostage situation. Trainor dep. 17-18; Murphy Affidavit ¶ 2.

5. Immediately after the October 4, 2001 simulation, plaintiff left HCC and shortly thereafter filed for workers' compensation for a back or shoulder injury. Trainor dep. 18-26, 143; Murphy Affidavit ¶ 3. She remained out on workers' compensation for six (6) months. Trainor dep. 23-24.

6. On October 9, 2001, plaintiff requested a transfer to a different correctional facility. Murphy Affidavit ¶ 3. Plaintiff requested the transfer because of the simulation, not because of any of the allegations underlying this litigation. Trainor dep. 129, 132. The transfer request was granted on October 24, 2001, and accepted by plaintiff on October 26, 2001. Murphy Affidavit ¶ 3; Exhibit 1. Thus, plaintiff never returned to work at HCC after the October 4, 2001 hostage training simulation. By approving the transfer request, DOC permitted plaintiff to bump other employees who had more time on the transfer list for that particular facility. Trainor dep. 129.

7. On or about October 24, 2001, an underground newsletter was found in the correctional staff's dining area at HCC. Murphy Affidavit ¶ 4. This area is accessible to correctional staff with only limited, supervised access by inmates. Id. A true and accurate copy of the underground newsletter is attached as Exhibit 2. Murphy Affidavit ¶ 5.

2

8. The underground newsletter was specific to HCC and contained offensive and inappropriate racial and sexual statements regarding HCC captains, lieutenants, and correctional officers, both men and women. Trainor dep. 104-05; Exhibit 2; Murphy Affidavit ¶ 6. *See* amended complaint ¶ 11.

9. When Warden Murphy was first appointed to HCC in early 2000, there had been two other underground newsletters at HCC, the first within a week of his arrival, and the second within a few weeks thereafter. Murphy Affidavit ¶ 7. At that time, Warden Murphy ordered all copies gathered and shredded, and was unable to ascertain who had written, published or disseminated the underground newsletters. Id.

10. Compared to the 2000 underground newsletters, the October 2001 underground newsletter was remarkable for its even more extreme views and the virulence of its personal attacks. Murphy Affidavit ¶ 8.

11. The October 2001 underground newsletter also contained an inappropriate paragraph about the plaintiff being out on workers' compensation. Exhibit 2; Murphy Affidavit ¶ 9. *See* amended complaint ¶ 11.

12. The underground newsletter was anonymously written. Plaintiff does not know who wrote it, and concedes that it is possible that the newsletter was written by a correctional officer. Trainor dep. 65-67, 83-84, 106, 117. Plaintiff heard rumors about who wrote it but she never shared those rumors with either DOC or the Commission on Human Rights and Opportunities. Trainor dep. 66-67, 106.

13. The Department of Correction management does not know who wrote the underground newsletter. Murphy affidavit ¶ 10.

14. Plaintiff has no reason to believe that either Warden Murphy or Commissioner Armstrong had any role in the writing, publishing or dissemination of the underground newsletter. Trainor dep. 63-65, 100-01, 109-116.

15. Warden Murphy had no role in the writing, publishing or dissemination of the underground newsletter. Murphy affidavit ¶ 11-12.

16. The plaintiff does not know how the underground newsletter was published or disseminated. Trainor dep. 83-84. She concedes that a correctional staff member could have brought the underground newsletter into the facility in their pocket or training folder. Trainor dep. 96-100.

17. DOC and Murphy do not know how the underground newsletter was published or disseminated. Murphy Affidavit ¶ 11. Warden Murphy assumes that a correctional staff member brought it into the facility in his or her pocket or lunch. Id.

18. In the third week of October 2001, the plaintiff received a copy of the underground newsletter at home. Trainor dep. 85-86. The envelope was handwritten; but the plaintiff threw the envelope away. Id.

19. Plaintiff has no reason to believe that either Murphy or Armstrong had any role in mailing the underground newsletter to her house. Trainor dep. 126-128. Murphy did not send the underground newsletter to plaintiff, nor does he know who did. Murphy Affidavit ¶ 12.

20.     Plaintiff did not contact or report to DOC anything about the underground newsletter until she filed her complaint with the Commission on Human Rights and Opportunities ("CHRO") on or about December 6, 2001. Trainor dep. 106-07; Murphy Affidavit ¶ 25. The plaintiff's complaint was served on DOC at the very end of December 2001.

21.     Shortly after the underground newsletter was found, the Commissioner of Correction, John Armstrong, was holding his monthly "Commissioner's Meeting", where all of the wardens, deputy commissioners and top administrative staff of the DOC would meet with and report to the Commissioner. Murphy Affidavit ¶ 13.

22.     Warden Murphy brought the underground newsletter to the Commissioner's Meeting. Murphy Affidavit ¶ 14. Upon seeing the underground newsletter, Commissioner Armstrong immediately brought it before the assembled group, denounced it and similar newsletters that periodically appeared at other facilities. Id. Armstrong instructed the group to address the underground newsletter issue wherever it appeared, and informed them that he would contact and work with the union to address the underground newsletter problem. Id.

23.     The next weekday after the Commissioner's meeting, Warden Murphy attended roll call at HCC. Murphy Affidavit ¶ 15. During roll call, Murphy denounced the underground newsletter, and warned HCC correctional staff that whomever had written the underground newsletter would face employment consequences, and due to the offensive and inappropriate nature of the underground newsletter, there might be civil consequences as well. Id. Murphy requested that anyone who had any facts regarding the underground newsletter to come forward with that information. Id.

24. Warden Murphy also directed his staff to gather any and all copies of the underground newsletter and to shred all copies. Murphy Affidavit ¶ 16.

25. No one came forward with any information regarding the underground newsletter, and Warden Murphy was unable to ascertain who had written or disseminated the underground newsletter. Murphy Affidavit ¶ 17.

26. Thus, on October 30, 2001, Warden Murphy requested the Director of DOC's Central Intelligence Unit, James Huckabey, to investigate who wrote and disseminated the underground newsletter. Murphy affidavit ¶ 18. A true and accurate copy of Warden Murphy's request is attached as Exhibit 3.

27. The Central Intelligence Unit conducted its investigation in early November 2001. Murphy affidavit ¶ 19. A true and accurate copy of the unit's November 14, 2001 report, including a July 2002 addendum, is attached as Exhibit 4. The unit interviewed the captains and lieutenants on duty, as well as some correctional officers, but was unable to ascertain who wrote or distributed the underground newsletter. Exhibit 4.

28. Commissioner Armstrong also wrote a letter to the union, condemning the contents of the letter and asking for the union's assistance in the matter. Murphy Affidavit ¶ 20. A true and accurate copy of the letter is attached as Exhibit 5.

29. The union never provided any information as to who was responsible for the anonymous newsletter. Murphy Affidavit ¶ 21.

30. Plaintiff had no idea as to how DOC should eradicate underground newsletters. Trainor dep. 114-116.

31.     DOC has a widely published sexual harassment reporting policy and procedure. Murphy Affidavit ¶ 22. A true and accurate copy of the policy in effect at the time is attached as Exhibit 6.

32.     From the time she was hired by DOC, Plaintiff was aware of the DOC administrative directive on sexual harassment. Trainor dep. 15-16.

33.     Plaintiff had received affirmative action and diversity training at DOC. Trainor dep. 13-14.

34.     Plaintiff was aware that there was an affirmative action office at DOC. Trainor dep. 15.

35.     Plaintiff was aware that there was a process and procedure in place to make affirmative action complaints. Trainor dep. 16.

36.     The DOC sexual harassment reporting policy permits a report of sexual harassment to be made to a supervisor, the Unit Administrator (for HCC, Warden Murphy), the Affirmative Action Unit or the Commissioner. Murphy Affidavit ¶ 22. If a report regarding sexual harassment at HCC was made to either a supervisor or the Affirmative Action Unit, Warden Murphy would have been informed. Id.

37.     Warden Murphy never received a sexual harassment report regarding plaintiff or from plaintiff until she filed her complaint with the Commission on Human Rights and Opportunities in December 2001. Murphy Affidavit ¶ 24. The only incident report filed by plaintiff in the fall of 2001 concerned her application for worker's compensation benefits due to the October 4, 2001 hostage simulation. Id.

38. Plaintiff contends that one of her co-workers, Correctional Officer ("CO") Marion Baker, approached her sometime in early 2001, and indicated that he wanted to insert his night stick into her vagina. Trainor dep. 76-77; amended complaint ¶ 9(a). She alleges that at some time before the night stick comment, Baker told her he wanted to know what it was like to sleep with a white girl. Id.

39. Based on her training on sexual harassment and on employee conduct, plaintiff was trained to file an incident report for incidents of the magnitude of the Baker situation, but she did not do it. Trainor dep. 74, 77. She also did not report them to the affirmative action office. Trainor dep. 75. See also Murphy Affidavit ¶¶ 23-24; plaintiff's response to interrogatory no. 16, attached at Tab C.

40. Plaintiff contends that she complained orally about comments made by CO Baker to her supervisor Captain Todd Case. Trainor dep. 70-72; plaintiff's response to interrogatory no. 16; amended complaint ¶ 10.[2] Plaintiff wanted the issue with CO Baker to be resolved informally, and for the conduct to stop. Trainor dep. 74-75.

41. CO Baker had no supervisory authority over plaintiff. Trainor dep.77-78.

42. After the "night stick" comment, plaintiff had several other conversations with CO Baker without incident. Trainor dep. 77-78.

43. The "night stick" comment was the only such comment plaintiff heard from CO Baker. Trainor dep. 83.

44. Since 2001, plaintiff has had no further contact with CO Baker. Trainor dep. 154.

---

[2] Captain Case denies that any such report was made to him. For purposes of summary judgment only, the defendant submits plaintiff's version of the oral report, reserving its right to present a full defense on the issue, if necessary, at trial.

8

45. Plaintiff contends that one of her co-workers, CO James Waterman, approached her in the fall of 2001, and brushed his hands across her knees, indicating that she had dirty knees from kneeling while performing sexual acts. Amended complaint ¶ 9(b); plaintiff's response to interrogatory no. 15.

46. The "dirty knees" comment was the only such comment plaintiff heard from CO Waterman. Trainor dep. 83.

47. CO Waterman had no supervisory authority over plaintiff. Trainor dep. 43.

48. Plaintiff never brought the incident with Waterman to anyone's attention. Trainor dep. 147-48; plaintiff's response to interrogatory no. 16.

49. Since 2001, plaintiff has had no further contact with CO Waterman. Trainor dep. 154.

50. Plaintiff never made complaints about her supervisors. Trainor dep. 43. Her lawsuit is about her two co-workers and the underground newsletter. Id.

DEFENDANT
STATE OF CONNECTICUT
DEPARTMENT OF CORRECTION

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____
Jane B. Emons
Assistant Attorney General
Federal Bar No. ct16515
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5340
Fax: (860) 808-5385
Jane.Emons@po.state.ct.us

9

ATTACHMENTS

**Tab A**: Transcript excerpts from deposition of Teresa Trainor

**Tab B**: Affidavit of Peter Murphy
Exhibit 1    Plaintiff's approved and accepted transfer request
Exhibit 2    October 2001 underground newsletter
Exhibit 3    October 30, 2001 Request for Investigation to J. Huckabey
Exhibit 4    Facility Investigations Unit Report on underground newsletter
Exhibit 5    Armstrong Letter to Union
Exhibit 6    DOC policy and procedures for reporting sexual harassment

**Tab C**:    Excerpts from plaintiff's responses to discovery requests

## CERTIFICATION

I hereby certify that a true and accurate copy of the foregoing Defendant's Statement of Material Facts Not in Dispute was served in accordance with Rule 5(b) of the Federal Rules of Civil Procedure by first-class mail, postage prepaid, on this 5th day of January, 2004 to:

William H. Paetzold, Esq.
Moriarty & Paetzold, LLC
140 Hebron Avenue, Suite 102
Glastonbury, CT 06033

Kevin A. Randolph, Esq.
15 Mountford Street
Hartford, CT 06114

_____
Jane B. Emons
Assistant Attorney General