03 CV 1230

A

```
 1      IN THE UNITED STATES DISTRICT COURT

 2      FOR THE DISTRICT OF CONNECTICUT

 3

 4      -------------------------------x          COPY

 5      TERESA TRAINOR,                    :

 6                  Plaintiff,             :

 7                                         :

 8      ,    vs.                           :CIVIL ACTION NO.
                                            3:02CV123(AWT)
 9      STATE OF CONNECTICUT,              :

        DEPARTMENT OF CORRECTIONS,

10                                         :

                    Defendant.

11      -------------------------------x

12

13

14              Deposition of TERESA TRAINOR, taken

15      pursuant to Notice, at the Office of the Attorney

16      General, 55 Elm Street, Hartford, Connecticut,

17      before Cathy J. Dabakis, LSR, a Notary Public in

18      and for the State of Connecticut, on July 10, 2003,

19      at 10:14 a.m.

20

21

22

23

                    BRANDON SMITH REPORTING SERVICE

24                        (860) 549-1850

                        44 Capitol Avenue

25              Hartford, Connecticut  06106
```

Trainor vs State of Ct./DOC

7/10/2003                                                          Teresa Trainor

Page 10

1     the Department of Corrections?

2            A     August 19, 1994.

3            Q     And prior to that, where had you worked?

4            A     The Hartford Insurance Group.

5            Q     For how long?

6            A     Twelve years.

7            'Q     At the point where -- from the time that

8     you have been employed with the Department of

9     Corrections, had you engaged in any other

10    employment at all, part-time, full-time?

11           A     I work for the town of Columbia, closing

12    a rec gate.

13           Q     Okay.  And how long has that been?

14           A     Three years.

15           Q     Where is that, at one of the schools or

16    parks?

17           A     Park.

18           Q     And what did you do at the Hartford

19    before you came to the Department of Corrections?

20           A     Customer service representative.

21           Q     Okay.  What led you to come to the DOC?

22           A     I got laid off.  I needed a job.

23           Q     Okay.  And how did you arrive at the

24    Department of Corrections?  How did you get there

25    as opposed to anyplace else?

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct. DOC

7/10/2003                                                        Teresa Trainor

Page 11

1      A      The unemployment office had an

2    application, and I filled it out.

3      Q      Okay.  What process did you have to go

4    through in order to become employed at the DOC?

5      A      Taking a test, a physical, and then an

6    interview.  That was it.

7      Q      And someone called you?

8      A      Yes.

9      Q      Okay.  And you went through the academy?

10     A      Yes.

11     Q      How long was that?

12     A      Really can't remember.  I think it was

13   four or five weeks.  I don't remember, I really

14   don't.

15     Q      Okay.  Where was your first position?

16     A      Hartford Correction Center.

17     Q      And have you been there ever since?

18     A      Up until I transferred to Bergin.

19     Q      Okay.  So you had been at Hartford for a

20   lengthy period of time?

21     A      Yes.

22     Q      Okay.  And what was your position?

23     A      Correctional officer.

24     Q      And was it always correctional officer?

25     A      Yes.

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct. DOC

7/10/2003                                                    Teresa Trainor

Page 13

```
 1   or --
 2         A     Oh, yes.
 3         Q     Okay.  And he was at Hartford from when
 4   to when?
 5         A     I couldn't tell you.
 6         Q     Okay.  When did he leave?
 7         A     I don't recall the exact date.
 8         Q     Approximately?
 9         A     Three years.
10         Q     Okay.  Okay.  When you came to the
11   Department of Corrections, did you receive an
12   employee handbook?
13         A     Yes.
14         Q     And did you receive training on
15   affirmative action?
16         A     Very little.
17         Q     My question was did you receive training
18   on affirmative action?
19         A     Yes.
20         Q     Okay.  And as part of that training
21   component, did you receive training on sexual
22   harassment?
23         A     Not that I recall.
24         Q     Had you ever attended a sexual harassment
25   training during -- since 1994 when you were
```

Brandon Smith Reporting Service

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

Page 14

1    employed by the Department of Corrections?

2        A    Yes.

3        Q    And when do you recall receiving that

4    training?

5        A    Last year.

6        Q    Okay.  And when was that?

7        A    I don't recall the exact date.

8        Q    Okay.  And are you telling me now that

9    you never received any training from the Department

10   of Corrections in sexual harassment issues since

11   1994?

12       A    Let me think.  We had -- you know, I

13   really don't recall.  I really don't.  We go to a

14   mandatory training every year, but I don't recall

15   if that was part of it.

16       Q    Okay.  So it's possible that you could

17   have received sexual harassment training?

18       A    Possibly.

19       Q    But you did receive diversity training;

20   is that correct?

21       A    Yes.

22       Q    Okay.  And were the people who trained

23   you from the affirmative action office?

24       A    No.

25       Q    Do you recall who did the training?

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct. DOC

Teresa Trainor

1      A      Lieutenants and correctional officers.

2      Q      And where was that training?

3      A      At MacDougall.

4      Q      And had you ever received training from

5  anyone in the affirmative action unit?

6      A      Not that I recall.

7      Q      Okay.  Were you aware that there was an

8  affirmative action office?

9      A      Yes.

10      Q      And how did you become aware of that?

11      A      It's hung up in the O.M., a poster.

12      Q      Okay.  And do you recall whether or not

13  that information is in your handbook?

14      A      No.

15      Q      Are you aware of -- strike that.

16             Are you aware that the Department of

17  Corrections has what are known as administrative

18  directives?

19      A      Yes.

20      Q      Are you aware that there are lengthy

21  administrative directives on employee conduct?  Are

22  you aware that there is one on employee conduct?

23      A      Yes, I am.

24      Q      And you are aware that there is one on

25  sexual harassment?

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Page 16

1          A      Yes, I am.

2          Q      And you have known about those from the

3    time that you have come to the Department of

4    Corrections; is that correct?

5          A      Yes.

6          Q      And you were aware from the time that you

7    came to the Department of Corrections that there is

8    a process and a procedure in place for people to

9    make affirmative action complaints?  Whether you

10   choose to use them or not is another story, but you

11   are aware that there is a process and procedure in

12   place?

13         A      Yes.

14         Q      Okay.  Do you have any criminal history

15   at all?

16         A      No.

17         Q      Ever been arrested?

18         A      No.

19         Q      Okay.  Do you take any medications?

20         A      Yes.

21         Q      What do you take?

22         A      Paxil.

23         Q      And who prescribed Paxil?

24         A      Dr. Thomas Harris.

25         Q      And who is Dr. Thomas Harris?

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct. DOC

7/10/2003                                                  Teresa Trainor

Page 17

1        A      My physician.

2        Q      And how long has he been your physician?

3        A      Five years.

4        Q      And how did you end up taking Paxil?

5        A      I had an incident at Hartford

6    Correctional Center that disturbed me.

7        Q      And what was that incident?

8        A      There was a simulation that was held at

9    Hartford Correctional Center where I was taken

10   hostage by another officer on the direction of a

11   captain and a major, and they forgot to notify the

12   outside authorities that they were doing the

13   simulation.  A woman from the post office

14   apparently saw me being held hostage, and people

15   responded.

16       Q      Okay.  You were aware that this was part

17   of a simulation; am I correct?

18       A      Yes.

19       Q      And when that was going on, that was

20   something you volunteered to do as part of your

21   training?

22       A      I was asked to do it by a captain, yes.

23       Q      Right.  And you had no problem, you said

24   fine; am I right about that?

25       A      Yes.

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

Page 18

1        Q    Okay.  And things, for lack of a better

2    word, turned sour when someone thought that it was

3    real and outside agents responded to that

4    simulation; is that correct?

5        A    Very much so.

6        Q    Okay.  And who came?

7        'A    I can't name them all.  I was terrified.

8        Q    Terrified --

9        A    I know the Hartford police were there.

10       Q    Right.  Terrified of what?

11       A    The guns, the dog, the fact that there

12   was a real possibility that someone was really

13   going to get hurt.

14       Q    Okay.

15       A    Me.

16       Q    And when -- well, do you know whether or

17   not it was clear to them that you were the supposed

18   hostage in that situation?

19       A    I have no idea what was clear to them.

20       Q    Okay.  Do you envision that you would

21   have gotten any more hurt than anyone else, or were

22   you just concerned only for yourself?

23       A    I was scared.

24       Q    Okay.  Now, as part of the simulation --

25   why don't you tell me or put on the record, what is

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Page 19

1    a simulation?  I mean, what's the purpose of it?

2         A     We were supposed to be trained on how to

3    react in a hostage situation or any situation

4    inside a facility.  Facilities can tend to be very

5    dangerous.

6         Q     Okay.  And you had done that as part of

7    your training in the first place, am I right about

8    that, when you went to the academy?

9         A     Not so much at the academy.  Simulations

10   are done on a monthly basis at all the facilities.

11        Q     Have you ever involved yourself in a

12   simulation prior to this incident?

13        A     No.

14        Q     Okay.  Is there any reason that you have

15   not been in one up to this point?

16        A     I was never asked.

17        Q     Okay.  So they asked you to do one at

18   this time?

19        A     Yes.

20        Q     Okay.  You indicated that the police

21   responded; do you remember how many police

22   responded?

23        A     No, I don't.

24        Q     Did fire people respond?

25        A     I don't remember.

Trainor vs State of Ct./DOC

Page 20

1        Q     You had dogs, you said dogs responded.

2     Was it a police dog or a correctional dog?

3        A     I have no idea.

4        Q     Are you aware that correction officers do

5     have dogs as well?

6        A     Yes.  We have a canine unit.

7        'Q    Okay.  I'm going to ask you again, do

8     you -- how many dogs do you recall seeing?

9        A     One.

10       Q     And you don't know whether it belonged to

11    a policeman or to a correctional person?

12       A     No idea.

13       Q     Okay.  How many people did you see with

14    guns?

15       A     I have no idea.  I didn't count.

16       Q     Well, I'm going to ask you to give it

17    your best thought?

18       A     I can't.

19       Q     Well, how many guns did you recall

20    seeing?  I'm not asking you how many people had

21    guns, I'm asking you how many you recall seeing?

22       A     'I don't know.  I mean, it was a scary

23    situation.  I have no idea.  I couldn't begin to

24    tell you.

25       Q     Okay.  You are trained in the use of

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

7/10/2003                                                    Teresa Trainor

Page 21

1    weapons; am I correct about that?

2         A    Not really.

3         Q    Do you -- well, when you say not really,

4    what are you saying?

5         A    I went to one firearms class.  That was

6    it.

7         Q    Did you ever shoot a firearm?

8         A    At the firearms class?

9         Q    I'm asking, did you shoot a firearm?

10        A    Yes.

11        Q    Were you trained to clean that firearm?

12        A    No.

13        Q    Were you trained to hold that firearm?

14        A    Yes.

15        Q    And you were trained to shoot that

16   firearm?

17        A    Yes.

18        Q    Are you aware that -- and that was before

19   the simulation; am I correct?

20        A    Yes.

21        Q    Okay.  You are aware that people at the

22   correctional facility do have guns?

23        A    Oh, yes.

24        Q    Okay.  And you're aware that police carry

25   guns?

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

Page 22

```
1        A    Yes.

2        Q    Okay.  And I guess what frightened you,

3   and correct me if I'm wrong, was that this was kind

4   of a simulation that turned real, for lack of a

5   better word, for the moment until the authorities

6   learned that a simulation was, in fact, going on;

7   is that right?

8        A    Yes.

9        Q    Okay.  And as a result of the

10  simulation -- do you remember what day that was?

11       A    Not the exact date.  It was October of

12  2001.

13       Q    Okay.  And you left the facility that

14  day; am I correct?

15       A    I went home.

16       Q    And when did you first go to a doctor as

17  a result of that?

18       A    The next day.

19       Q    And was it Dr. Harris?

20       A    Yes, it was.

21       Q    And as a result of that simulation, you

22  also went out on Workers' Comp; is that correct?

23       A    Yes.

24       Q    Because you hurt yourself?

25       A    Yes, I did.
```

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

Page 23

1       Q     Can you tell everyone what it was that

2    got hurt?

3       A     My back and my neck.

4       Q     And how did that happen?

5       A     The officer that was holding me pulled me

6    backwards.  We were both scared, and he didn't mean

7    to hurt me.  He just pulled me backwards.  He was

8    bigger than I was.  When he pulled back, he pulled

9    up and back and hurt my back and my neck.

10      Q     When you say pulled you backwards and you

11   said you were both scared, is that when the other

12   people came?  Is that when he pulled you

13   backwards --

14      A     When the other --

15      Q     -- when the police came or --

16      A     When whoever arrived, yes.

17      Q     Okay.  So you went out on Workers' Comp

18   from that day?

19      A     Yes, I did.

20      Q     Okay.  And how long did you stay out on

21   Comp?

22      A     I was out until February 15th.

23      Q     So you were out from October, I think it

24   was early October, until --

25      A     February 15th.

Trainor vs State of Ct./DOC

7/10/2003                                                                Teresa Trainor

Page 24

```
1        Q      -- February 15th.  So you were out on
2    Comp for six months; is that correct?
3        A      Yes.
4        Q      While you were out on Comp, because it
5    was an injury that took place in the facility, you
6    received 100 percent of your salary; is that
7    correct?
8        A      No, I did not.
9        Q      What did you receive?
10       A      It wasn't inmate-related.  I don't know,
11   whatever they pay.
12       Q      Okay.  Is it possible it was 75 percent
13   of your salary?
14       A      It's possible.
15       Q      And it was tax-free; am I right about
16   that?
17       A      Yeah.
18       Q      Okay.  And you came back.  Now, did you
19   see Dr. Harris for the entire time that you were
20   out?
21       A      No.  I saw Dr. Powell.  He referred me to
22   Mary Powell, who was the one that took care of my
23   back.
24       Q      How do you spell that?
25       A      P-O-W-E-L-L.
```

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct., DOC

1        Q     Okay.  She was the back doctor?

2        A     Yes.

3        Q     And she took care of your back; was she

4    an orthopedic doctor?

5        A     Yes.

6        Q     Now, how often did you see Dr. Harris for

7    Paxil?

8        A     Oh, I still get it refilled.  I'm still

9    on it.

10       Q     That's what I want to find out from you.

11   When did he first prescribe it for you?

12       A     When I came in the next day.

13       Q     Okay.  And how many milligrams do you

14   take?

15       A     Ten.

16       Q     And how often do you see him?

17       A     I don't.

18       Q     So Dr. Harris is prescribing Paxil for

19   you on a regular basis, and you haven't seen him

20   since that first day?

21       A     Oh, I've seen him since the first day

22   for, like, I get physicals and I talk to him and --

23       Q     When is the last time that you saw Dr.

24   Harris?

25       A     When I took my son in last Monday.

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

Page 26

```
1         Q    Okay.  And does your son go to Dr.

2    Harris, also?

3         A    We all do, yes.

4         Q    When did you last see Dr. Harris for you,

5    the last time?

6         A    Last -- well, I was scheduled to go this

7    July 1st, so I'm going to say last July.

8         Q    Okay.  So you haven't seen Dr. Harris in

9    a year for yourself?

10        A    Right.

11              MS. EMONS:  Okay.  I just want to

12          note on the record at this point with

13          counsel present that I have made a

14          request of all medical bills, notes,

15          documents, things of that nature.  The

16          only one that I have received is a couple

17          of pages from a psychiatric treater.  I

18          have not seen Dr. Harris's or Dr.

19          Powell's records.  Would you mind looking

20          into that and getting them to me as soon

21          as possible?

22              MR. RANDOLPH:  That's fine.

23              MS. EMONS:  Okay.  And I will

24          provide authorizations if you don't.  But

25          given the HIPAA rules and regulations, I
```

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Page 43

1    trip that went out just recently.

2          Q    Okay.  Have you ever made any complaints

3    about any supervisor for any reason?

4          A    Supervisor, no.

5          Q    Okay.  Have you ever made any complaints

6    about any co-worker for any reason?"

7      ,    A    Yes.

8          Q    And what's that?

9          A    Marion Baker and Jim Waterman, because of

10   their behavior.

11         Q    Okay.  And is that part of these

12   lawsuits?  That's actually part of the lawsuits?

13         A    Yes.

14         Q    Anything that is not part of the lawsuits

15   that you have complained about a co-worker?

16         A    Just recently, as a matter of fact; I

17   believe it was last week or two weeks ago.

18   Attorney Paetzold has the incident report.

19         Q    Can you tell me about it?

20         A    Sure.  There's an officer at Bergin who

21   decided that he wanted to know about the Joe

22   Carlone incident, inquired with other officers

23   about it, then went around telling everybody.

24         Q    Okay.  And who was that officer?

25         A    Officer Garvin(ph).  I don't know his

Trainor vs State of Ct./DOC

7/10/2003

Teresa Trainor

Page 63

1                     MR. RANDOLPH:  Objection as to form.

2    BY MS. EMONS:

3         Q    You can answer.

4                     MR. RANDOLPH:  Do you understand the

5              question?

6                     THE WITNESS:  No.

7    BY MS. EMONS:

8         Q    Okay.  You said that somebody should pay.

9    I asked you who you think should pay.  Let me ask

10   it again:  Who do you think should pay?

11        A    The state.

12        Q    Okay.  And who is the state?  What is

13   your understanding of the state?

14        A    The Department of Corrections.

15        Q    Okay.  Who in the Department of

16   Corrections do you believe is responsible for these

17   things that you allege?

18        A    Several people.

19        Q    Who?

20        A    The commissioner for allowing it to go

21   on, knowing -- with full knowledge that these

22   things have been passed around for years.

23        Q    Do you have personal knowledge that the

24   commissioner is aware, was aware, of this

25   particular newsletter?

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

7/10/2003                                                        Teresa Trainor

Page 64

```
 1        A     Personal knowledge?

 2        Q     Yes?

 3        A     No.

 4        Q     Do you have any kind of knowledge that he

 5    was aware of this particular newsletter prior to it

 6    coming out?

 7        A     Prior to it coming out?

 8        Q     Yes?

 9        A     No.

10        Q     Do you believe that he wrote that

11    newsletter?

12        A     I don't know.

13        Q     Okay.  And you have no personal knowledge

14    that he did or did not?

15        A     None whatsoever.

16        Q     And you have no personal knowledge that

17    he knew of the newsletter until it was out; is that

18    correct?

19        A     That's correct.

20        Q     Or until sometime after it was out?

21        A     That particular newsletter?

22        Q     Yes?

23        A     No.

24        Q     And Peter Murphy, you don't believe that

25    Peter Murphy wrote that newsletter, do you?
```

Brandon Smith Reporting Service

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Page 65

1        A    I don't know.

2        Q    Do you have any personal knowledge that

3   he wrote that newsletter?

4        A    No, I do not.

5        Q    Do you have any personal knowledge that

6   he knew that it was being written?

7        A    No.

8        Q    And do you have any personal knowledge

9   that he was aware of it until after it came out?

10       A    No.

11       Q    All right.  Who do you believe should

12   pay?

13       A    The Department of Corrections.

14       Q    Why do you believe that the Department of

15   Corrections should pay for something that someone

16   did?

17       A    Because it is inside of the facility,

18   facilities.  They are aware of past ones.  Nothing

19   was ever done to stop any of them.

20       Q    How do you know that?

21       A    If it was, it would have stopped.

22       Q    Do you know whether or not people tried

23   to stop those newsletters in the past?

24       A    No, I don't.

25       Q    Okay.  Go ahead.  Okay.  Who do you

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Page 66

```
1      personally believe is responsible for writing that

2      newsletter?

3           A    I have no idea.  I wish I knew.

4           Q    Do you have any idea who is under any

5      type of investigation or whose name surfaced --

6           A    No.

7          'Q    -- as far as writing that newsletter?

8           A    No.

9           Q    Do you hear any rumors as to who wrote

10     that newsletter?

11          A    Several.

12          Q    Tell me every single one?

13          A    Um, there was a Captain -- God, what is

14     his name? -- Davis.  I believe he works at the

15     security division.  There was an Officer

16     Nash, Officer Baker, Officer John Edwards, Officer

17     Gilbert.  I'm sorry.  And those are just a few.

18          Q    And how did those rumors come to you?

19          A    People talking.

20          Q    Who is "people talking"?

21          A    I actually got a phone call from an

22     Officer Fontaine who specifically said that Officer

23     Baker was involved.

24          Q    Now, who is Officer Fontaine?

25          A    She's a girl that works at Hartford
```

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

1    Correctional.

2         Q    And how does she know that Officer Baker

3    was involved?

4         A    I have no idea.  I told her I didn't want

5    to hear anything and hung up the phone.

6         Q    Okay.  Who else?

7         A    Those are the rumors I heard.

8         Q    Okay.  Did you provide that information

9    to anyone at the Department of Corrections?

10        A    At the Department of Corrections?

11        Q    Yes?

12        A    No.  I filed a lawsuit when I got that.

13        Q    Right.  And did you ever tell anyone

14   those names or that information at the CHRO when

15   you went to the CHRO?

16        A    I didn't go to CHRO.

17        Q    Yes, you did go to the CHRO.  You didn't

18   have a fact-finding.  Did you provide at any time

19   through a complaint or any other process that

20   information to the CHRO?

21        A    No.

22        Q    You're aware that the security division

23   did an investigation at DOC; did you provide those

24   names or any of that information to the security

25   division?

Trainor vs State of Ct./DOC

7/10/2003                                                          Teresa Trainor

Page 70

1    Officer Waterman -- and captains and wardens have

2    seen Officer Waterman come up and wipe off females'

3    knees; they don't do it to the guys.

4              Also, Marion Baker has been under

5    investigation a couple times for his lewd behavior,

6    thinking that he can stick his night stick anyplace

7    he wants; and I went to Captain Case about that.

8         Q    I'm going to ask you about that.

9         A    He wouldn't have done that to a guy.

10        Q    I'm going to ask you about that

11   afterwards.  When you indicate that there's a

12   hostile, offensive, and threatening workplace for

13   females, what are you talking about?

14        A    The letters, the newsletters, the

15   gestures that go on all the time with sexual --

16   asking for sexual favors to make things a little

17   bit easier, those types of things.

18        Q    Okay.  You indicated in your complaint,

19   9a, sometime in the year 2001 with regard to Marion

20   Baker and Jim Waterman -- actually, this is Baker,

21   sometime in the year 2001.  When in 2001?

22        A    I don't recall the exact date.

23        Q    Well, do you recall an approximate date?

24        A    No.

25        Q    Well, let's try to think about seasons,

Brandon Smith Reporting Service

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

Page 71

```
 1    then.  Can you substantiate any time when his

 2    behavior took place with regard to the night stick

 3    incident?

 4         A    It was back in the supply.  What time of

 5    year, no.

 6         Q    When were you doing supply?

 7         A    I did supply for two years at Hartford.

 8         Q    Did you do it for the entire year of

 9    2001?

10         A    Yes.

11         Q    Okay.  So you cannot give a date?

12         A    Right.

13         Q    Could it have been the winter of 2001?

14         A    I don't know.

15         Q    Could it have been December of 2001?

16         A    I don't know.

17         Q    You have no idea, but you know it was

18    2001?

19         A    Right.

20         Q    How do you know that it was 2001 and not

21    2000?

22         A    Because I know when Marion Baker was

23    relieving me for supply, when he would come back

24    and do his little things.  It wasn't the first time

25    Marion Baker has done things.
```

Page 72

1      Q      When was he relieving you for supply?

2      A      They had him posted down there quite a

3   few times.  You would have to pull the rosters.

4      Q      What shift was this?

5      A      First.

6      Q      And he made the night stick comment to

7   you, according to what you indicated here.  Who did

8   you tell about that?

9      A      Captain Todd Case.

10      Q      When?

11      A      When it happened.

12      Q      And you have no clue?

13      A      Right.

14      Q      Okay.  And what did you tell him?

15      A      I told him what he said.  He told me he

16   would speak to "Big Daddy," and that's just Big

17   Daddy's way.

18      Q      Okay.  And did you file an incident

19   report?

20      A      No, I didn't.  He said he would take care

21   of it, and I believed him.

22      Q      You know what the DOC rules and

23   regulations are regarding incident reports; is that

24   correct?

25      A      Yes.  And I also know how Hartford takes

Page 74

1    know that when you have an incident of any kind,

2    much less an incident of this magnitude, that you

3    should file an incident report; isn't that correct?

4          A    No.

5          Q    Why is that not correct?

6          A    Because we don't always file incident

7    reports when something happens.

8          Q    Right.  Based on your training with

9    regard to sexual harassment and based on your

10   training with regard to employee conduct, you have

11   been trained that when there is an incident of this

12   magnitude, you should file an incident report;

13   isn't that correct?

14         A    Yes.

15         Q    Okay.  And you did not do that; is that

16   right?

17         A    That's correct.

18         Q    Was it your intention at that time by

19   telling your supervisor, Todd Case, about this

20   incident that you would have preferred to handle it

21   informally?

22         A    Yes.

23         Q    And what you really wanted, assuming that

24   what you're telling us is true, is that this

25   behavior stop?

Trainor vs State of Ct./DOC

7/10/2003                                                          Teresa Trainor

Page 75

1       A    What I'm telling you is true; and yes, I

2   did expect it to stop.

3       Q    What I'm asking you is that assuming that

4   what you're telling us is true, what you really

5   wanted was to simply stop this behavior on the part

6   of Marion Baker?

7       A    Yes.

8       Q    And assuming that what you're telling us

9   is true about going to Todd Case, what you wanted

10  him to do was to resolve this matter informally and

11  stop the behavior; is that a fair statement?

12      A    Yes.

13      Q    Okay.  You did not make a complaint to

14  the affirmative action office about Marion Baker's

15  behavior; is that right?

16      A    That's correct.

17      Q    The only person that you made a complaint

18  to was Todd Case?

19      A    That's also correct.

20      Q    And it was only an informal complaint, a

21  verbal complaint; is that right?

22      A    Yes.

23      Q    And what exactly did you say to him?

24      A    I told him exactly what Marion Baker had

25  done.

Brandon Smith Reporting Service

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

Page 76

1          Q     And what did you say?

2          A     I said that Officer Baker came back to

3     the supply department, he took a stick, and he said

4     he wanted to stick his night stick in my vagina.

5          Q     Right.  And what else did you ask Todd

6     Case?  What did you say to Case?

7          A     I asked him to please take care of him.

8          Q     Fine.  You indicated, I think, before

9     that you had heard him say those sorts of things on

10    numerous occasions?

11         A     Yes.

12         Q     To you?

13         A     Oh, yeah.  One time he told me he just

14    wanted to know what it was like to sleep with a

15    white girl.

16         Q     Do you know when that was?

17         A     No.

18         Q     Was it before the 2001 incident?

19         A     Yes.

20         Q     Okay.  Did you ever tell anybody about

21    that?

22         A     There were several people that heard it.

23    Everybody just laughed because it's Big Daddy.

24         Q     I'm asking you whether or not you ever

25    told anyone about it?

Trainor vs State of Ct./DOC

7/10/2003

Teresa Trainor

Page 77

1      A      No, I did not.  I walked away from it.

2      Q      Okay.  Did you ever overhear him say

3    these sorts of things to other people?

4      A      Yes.  Ms. Fontaine actually put it on the

5    intercom one day.  She got so tired of being in

6    control with him, she pushed a button and had it

7    over the P.A. system.

8      Q      And what was it that he said?

9      A      Something about her ass.

10     Q      Okay.  And did you ever as a result of

11   that file a complaint?

12     A      No.

13     Q      Okay.  And despite the fact that you knew

14   that there were proper procedures in place for

15   filing those types of complaints, you elected, for

16   whatever reason, not to file a complaint?

17     A      That's correct.

18            MR. RANDOLPH:  Objection as to form

19            with regard to proper procedures.

20   BY MS. EMONS:

21     Q      What type of interaction did you have

22   with Baker after June 2001, you know, somewhere in

23   the July/June/May area?

24     A      My interaction with Baker was varied.  It

25   was pretty much where we tried to do anything to

5d99102b-827a-4d4a-bdbd-a3c5643dca2a