Page 78

1    get rid of him.  You do swaps, you stand him up on

2    swaps.  You help him out with things, you don't

3    help him out with things.  Anything that would make

4    Baker go away.  You try to find a way to make Baker

5    go away.

6            Q    Now, he was a co-worker; am I right about

7    that?

8            A    Yes.

9            Q    Okay.  So he had no supervisory authority

10   over you; is that right?

11           A    No, none.

12           Q    Okay.

13           A    Yes, that's correct.

14           Q    Okay.  So it wasn't like he was issuing

15   you orders and you had to comply with anything; am

16   I right?  He's an equal to you?

17           A    Yes.

18           Q    With regard to Waterman, you indicated

19   that in the fall of 2001 he brushed his hands

20   across your knees?

21           A    Um-hum.

22           Q    Now, what's that about?

23           A    He does it all the time.  He takes his

24   knees and wipes them off, like you've gotten a post

25   or something because you've been under the

1    husband?

2        A    No.

3        Q    You indicated in 9c that on diverse

4    dates, dates unknown, Waterman and Baker made

5    vulgar and sexually explicit remarks towards you.

6    When were those comments made?

7        A    I don't know.

8        Q    You have no idea?  Okay.  What types of

9    comments were they?  Things you've already told me

10   about?

11       A    Correct.

12       Q    Okay.  Anything else?

13       A    No.

14       Q    Any other people engaged in that kind of

15   behavior with you that you have neglected to

16   indicate?

17       A    No.

18       Q    Let's talk about the newsletter.  You

19   indicated in paragraph 11 that it's published and

20   distributed throughout the Hartford Correctional

21   Center and other facilities; is that right?

22       A    That's correct.

23       Q    Now, do you know for a fact that it's

24   published at the Hartford Correctional Center?

25       A    Do I know that it's published there?  No.

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

7/10/2003                                                    Teresa Trainor

Page 84

 1    For a fact?  No.

 2         Q    Okay.  Do you know whether it's even

 3    written up there?

 4         A    No, I don't.

 5         Q    Do you have any information that leads

 6    you to believe that it may be written up there?

 7         'A    No, I don't.

 8         Q    Any rumors of any information leading you

 9    to believe that it might be published there?

10         A    No, I don't.

11         Q    Do you have any knowledge of how it is

12    distributed through the facility?

13         A    No, I don't.

14         Q    Do you know whether or not these

15    newsletters are published at any of the other

16    facilities?

17         A    Yes, I do.  As a matter of fact, I found

18    one that was published at Corrigan-Radgowski.

19         Q    You say you found it?

20         A    Yeah.

21         Q    Where did you find it?

22         A    It was laying around at the facility.

23         Q    At what facility?

24         A    Bergin.

25         Q    Okay.  Just laying around on somebody's

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

Teresa Trainor

1    desk?

2          A    Yes.

3          Q    Okay.  Where was it?

4          A    In the control center.

5          Q    Okay.  Was it a different newsletter than

6    that one?

7          A    Oh, yes, much different.

8          Q    Okay.  So they have their own newsletter?

9          A    Apparently.  I don't know that for a

10   fact.

11         Q    Is it a fair statement to call it or

12   refer to it at this point as an underground

13   newsletter?

14         A    Yes.

15         Q    How did you first learn of this letter?

16         A    Of the one that was mailed to me?

17         Q    Yes?

18         A    It was mailed to my house.

19         Q    And when was it mailed to your house?

20         A    In October.  I was out on Workers'

21   Compensation.  I don't know the exact date it came,

22   but I want to say it was the third week in October

23   when it came to my house.

24         Q    Okay.  Do you know who mailed it to you?

25         A    No.

Brandon Smith Reporting Service

Page 86

1           Q    Was it typewritten or handwritten?

2           A    It was handwritten.

3           Q    And did you bother saving the envelope?

4           A    No.  My daughter threw it away.  I didn't

5      know --

6           Q    And how what it addressed?

7          'A    The Trainor Family.

8           Q    Okay.  And you didn't retrieve it out of

9      the garbage?

10          A    No.

11          Q    And you didn't turn it over to the

12     police; is that correct?

13          A    No, I did not.

14          Q    Okay.  Had you ever seen one of these

15     letters before?

16          A    Yes, I had.

17          Q    Now, when did you ever see a letter prior

18     to the one that was mailed to your house?

19          A    I don't know the date of it, but there

20     was one that came out -- I want to say it was

21     months before, maybe even a year before.  I'm not

22     sure.  But it came out, and it was about, again,

23     about different people, different races, different

24     sex acts.  Just really nasty, nasty stuff.

25          Q    Okay.  Did you ever make a complaint

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Case 3:02-cv-01230-AWT    Document 17-3    Filed 01/05/2004    Page 6 of 33
Trainor vs State of Ct./DOC
7/10/2003                                                          Teresa Trainor

Page 96

```
 1         Q     Okay.  You indicated in paragraph 12 that
 2    Hartford Correctional Center is a secure
 3    correctional facility, and the distribution of
 4    correspondence or published materials is regulated
 5    by the department policy.  What are you talking
 6    about?
 7         'A     Anything that comes into the department
 8    has to be approved, into the Hartford Correctional,
 9    because of the security with the inmates, of
10    course.  So if something's coming in, they're
11    reviewing it before it gets distributed.
12         Q     Who's reviewing that?
13         A     The mailroom.
14         Q     Right.  Right.
15         A     They review it.  If it's something that
16    is not supposed to be there, a captain and/or a
17    lieutenant is assigned to review things.
18         Q     Right.  Now, if you were to bring in your
19    shopping list in your pocket, nobody is going
20    reviewed it, right?
21         A     If I were -- right.
22         Q     'If you walk in with your shopping list in
23    your back pocket, no one is going to --
24         A     No.  They have the right to, but are they
25    going to?  No.
```

Page 97

1          Q     Right.  So if someone takes a copy of

2    "P.R.I.D.E. AT WORK" and folds it up into four or

3    five folds and sticks it in their back pocket, no

4    one would have any clue that it's there; isn't that

5    correct?

6          A     That's correct.

7          Q     And no one would be in a position to

8    protect against the distribution of that type of

9    underground document; is that correct?

10         A     If they snuck it in that way, yes, I

11   would have to say that is correct.

12         Q     Right.  And that's how that may get

13   passed around within the institution; is that

14   correct?

15         A     I don't think so.

16         Q     Well, how do you figure it gets passed

17   around?

18         A     Well, first of all, if it's was folded

19   into five or six different pieces stuck in

20   somebody's back pocket, there wouldn't several

21   copies because that would be pretty obvious that

22   someone was bringing something in.  And if it were

23   folded, it would have shown that it was folded.

24   Pretty fair to say that it just comes through.

25         Q     Well, let me ask you this:  If somebody

Trainor vs State of Ct./DOC

Page 98

1    gets a copy in their pocket and they walk into the

2    facility and somebody else takes it to a copy

3    machine and makes a copy, even though they're not

4    supposed to do that, it's another way of getting it

5    around the facility; isn't that true?

6          A     It's possible.

7          Q     Probable, is that a fair --

8          A     Yes, possibly.

9          Q     Okay.  Do you have any other knowledge,

10   personal knowledge, of how that makes it into the

11   facility?

12         A     No.  I wish I did.

13         Q     Do you have any personal knowledge of how

14   it gets distributed throughout the facility?

15         A     No, I don't.

16         Q     Any rumors?

17         A     No.

18         Q     Any speculation --

19         A     No.

20         Q     -- as far as how it gets in or who does

21   it other than what you've told me?

22         A     No.  No.

23         Q     Let me ask you something:  Coming into

24   the facility in terms of your own personal body,

25   have you ever had any papers confiscated from you?

Brandon Smith Reporting Service

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Page 99

```
 1        A    No.

 2        Q    Have you ever been searched?

 3        A    No.

 4        Q    Have you ever seen anybody searched who

 5   works at the department?

 6        A    No.

 7        Q    So if six people walk in with one of

 8   these things in their pocket or in their -- well,

 9   in their pocket, nobody would know; is that right?

10   Are you allowed to carry anything in the facility

11   with you?

12        A    Our lunch bags.

13        Q    Okay.  If somebody has a couple of them

14   in their lunch bag, nobody's going to look at your

15   lunch, are they?

16        A    Yes.

17        Q    They look at the lunch bags?

18        A    Yes.  They inspect the lunch bags coming

19   in.

20        Q    Okay.  Can you bring a folder with papers

21   in and out, a notebook?

22        A    I've never done it.

23        Q    Have you ever seen people do that?

24        A    Yes.  If they're going to training --

25        Q    All right.  So if somebody's bringing --
```

Trainor vs State of Ct./DOC

7/10/2003                                                    Teresa Trainor

Page 100

1                    MR. RANDOLPH:  Objection.  She

2              should be allowed to finish her response.

3                    MS. EMONS:  You're right.

4    BY MS. EMONS:

5         Q    What were you going to say?

6         A    When we go to training, but that's --

7         'Q    Okay.  Have you ever seen people come and

8    go with notebooks?

9         A    Yes.

10        Q    Are they ever looked at?

11        A    When the attorneys come in, we inspect

12   them at the door.

13        Q    No, I'm talking about the C.O.'s?

14        A    No.

15        Q    They're never looked at, right?

16        A    No.

17        Q    You indicated in paragraph 13 that

18   Commissioner Armstrong's correspondence to the

19   AFSCME official took place after your CHRO

20   complaint.  Do you recall that in paragraph 13?

21        A    Yes.

22        Q    And you're implying that he did nothing

23   before that; is that correct?

24        A    Yes.

25        Q    Right.  Do you have any personal

Brandon Smith Reporting Service

Trainor vs State of Ct./DOC

Page 101

1    knowledge that he didn't do anything before that?

2          A    No.

3          Q    Do you have any personal knowledge that

4    he was even aware of this underground newsletter

5    prior to his writing the letter to AFSCME?

6          A    No, just an assumption.

7          Q    Okay.  But you have no knowledge that he

8    was aware?

9          A    No.  I don't speak to him personally.

10         Q    Okay.  Do you have any knowledge as to

11   whether others took action about this letter prior

12   to Armstrong becoming aware of it?

13         A    No.

14         Q    You indicated in paragraph 18 that DOC

15   officials knew or had reason to know of the hostile

16   environment and, despite knowing or having reason

17   to know, didn't do anything about it.  What are you

18   referring to there?

19         A    The newsletter, Marion Baker.  These

20   things have not just been going on since it

21   happened to me.  I know for a fact that Marion

22   Baker has been written up and referred to

23   affirmative action on a couple occasions and for a

24   fact that he's still employed with the Department

25   of Corrections.

Page 104

1    really can't substantiate that because you don't

2    know; is that correct?

3         A    Marion Baker is still working.

4         Q    That's not my question.  My question was

5    you don't know?

6         A    That's correct.

7         Q    And with Waterman still being under

8    investigation for whatever it is, if there's an

9    investigation, that implies that they're doing

10   something; isn't that correct?

11        A    Yes, if he's still under investigation.

12        Q    Right.  So when you say that they failed

13   to take prompt and effective measures, you really

14   don't know that, do you?

15        A    I don't know that for a fact.  Yes,

16   you're correct.

17        Q    Okay.

18                  (At the direction of Ms. Emons, off

19             the record at 11:51 p.m.)

20                  (On the record at 12:01 p.m.)

21   BY MS. EMONS:

22        Q    Let's take a look at the newsletter

23   again, if you don't mind.  I just want to reiterate

24   one of the things I saw.  If you take a look at the

25   newsletter, wouldn't you say it's a fair statement

Trainor vs State of Ct./DOC

7/10/2003

Teresa Trainor

Page 105

1    that the inappropriate language and accusations in

2    the newsletter are directed at both men and women?

3        A    Yes.

4        Q    In this newsletter, they say some pretty

5    nasty things about Captain Case?

6        A    Yes.

7        Q    Okay.  And Bapteste, I guess his name is;

8    is that right?

9        A    Yes.

10       Q    That's a man, am I right about that,

11   Bapteste?

12       A    Yes.

13       Q    And it says some really sexually explicit

14   and nasty things about him as well; is that right?

15   You want to take a look?

16       A    It's hard to read the copy.  It's really

17   bad.  But yes, it does.

18       Q    Okay.  And Lieutenant Reyes, down at the

19   bottom right before your paragraph?

20       A    Oh, yes.

21       Q    And that's pretty sexually explicit.

22   He's a man; am I right about that?

23       A    Yes, he is.

24       Q    And Lieutenant Maggio, he's a man?

25       A    Yes, he's a man.

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Page 106

1        Q     Okay.

2        A     Yes.

3        Q     Okay.  Again, I'm going to ask you, do

4     you know who authored this newsletter?

5        A     No.

6        Q     Do you suspect, other than Marion Baker

7     and a couple of names that you gave?

8        A     No, I have no idea.

9        Q     Okay.  And the rumors that you heard are

10    only the people who you've told me thus far; am I

11    right?

12       A     Yes.

13       Q     Are you in the process of trying to find

14    out who authored the newsletter?

15       A     Me personally, no.

16       Q     Do you know of anybody who's trying to

17    find out who authored the newsletter?

18       A     No.

19       Q     Have you ever brought -- other than in

20    the form of this lawsuit, have you ever brought

21    your suggestions of any authors to the Department

22    of Corrections?

23       A     No.

24       Q     After you received the newsletter but

25    before you filed your CHRO complaint, did you ever

Trainor vs State of Ct./DOC

7/10/2003

Teresa Trainor

Page 107

1   speak to anyone in a supervisory capacity at the

2   Department of Corrections?

3          A    No.

4          Q    Did you speak to Deputy Warden Murphy

5   about it?

6          A    Deputy Warden Murphy?

7          Q    Peter Murphy, Warden Murphy, I'm sorry.

8          A    No.

9          Q    Did you speak to anyone in the

10  affirmative action office?

11         A    No.

12         Q    Did you speak to anybody at the security

13  or intelligence unit?

14         A    No.

15         Q    Did you speak to the warden?

16         A    No.

17         Q    Did you speak to the commissioner?

18         A    No.

19         Q    Let's take a look at your defamation

20  complaint.  That's your state court case.  In

21  paragraph 7, you indicated that the defendants

22  Armstrong and Murphy had knowledge of the existence

23  of the newsletter?

24         A    Yes.

25         Q    Okay.  You really don't know that; is

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

Teresa Trainor

Page 109

1     received it, she had called the house from the

2     property department, using a state phone to call

3     me, to laugh about the fact that Warden Murphy had

4     this letter.

5           Q     Okay.  So --

6           A     Was I told?  Yes.

7           Q     Okay.  Do you have any knowledge

8     whatsoever that prior to them becoming aware of its

9     existence that they had any involvement in the

10    dissemination, drafting, or publication of this

11    newsletter?

12          A     No.

13          Q     Okay.  At some point, clearly, they

14    became aware of it; is that correct?

15          A     Yes.

16          Q     You indicated that Warden Murphy became

17    aware of it based on a phone call someone made to

18    you at your house?

19          A     That's correct.

20          Q     And that phone call was sometime after

21    the simulation when you were at home; is that

22    correct?

23          A     That's correct, also.

24          Q     But with regard to the dissemination, the

25    drafting, of this newsletter, you have no knowledge

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Page 110

1    at all --

2         A    No.

3         Q    -- that they were involved?

4         A    No.

5         Q    Okay.  You indicated that they implicitly

6    or expressly facilitated the malicious publication

7    and distribution of this.  What information do you

8    have that either of them did what you alleged they

9    did?

10        A    By them having -- I know for a fact based

11   on the phone call that I got that Peter Murphy had

12   it.  By them allowing it to still be in the

13   facility -- I don't care if it was in his office,

14   if it was in Susan Levy's office, or if it was in

15   Vicki Harpin's office.  People walk in and out of

16   places.  By still allowing and keeping that in that

17   particular environment, that certainly helps with

18   the facilitation of it, especially when you have

19   secretaries who get a big kick out of it and pass

20   it back and forth.

21        Q    Okay.  Other than that, what information

22   do you have that -- do you have any personal

23   knowledge that Peter Murphy disseminated or did

24   anything with this information?

25        A    No.

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

7/10/2003

Teresa Trainor

Page 111

```
 1        Q    Do you have -- other than the letter that
 2   Commissioner Armstrong wrote to AFSCME, do you have
 3   any personal knowledge that he even knew that it
 4   existed prior to his letter to AFSCME?
 5        A    No.
 6        Q    And wouldn't you agree that if they did
 7   do something about it, they would have to have a
 8   copy present in their office in order to write such
 9   a letter to AFSCME?
10        A    There would be no reason for Peter Murphy
11   to have a copy of it inside the facility that I
12   worked at.  There would be no reason for that.  No.
13        Q    Even if he were taking action against it?
14        A    Find someplace else and do it.  Don't
15   leave it inside.
16        Q    So the warden, if he were made aware of
17   this particular letter, of this particular
18   newsletter, should have to remove it from the
19   facility before he takes action in his official
20   capacity as a warden to try to resolve the fact
21   that this shouldn't be in existence?
22        A    I believe that in a professional manner,
23   that when someone is being disciplined and/or
24   something is going on about them, that that should
25   be confidential.  And if that means removing
```

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Page 112

1    yourself from a particular office to take care of

2    it at the State Capitol, then you do so.

3         Q    Okay.  Are you aware that when you filed

4    these complaints, you made this public for the

5    entire world to see?

6         A    Yes.

7         Q    And that's a decision that you chose?

8         A    Yes, because it has to stop.

9         Q    Okay.  And you don't know that the

10   Commissioner Armstrong -- the former Commissioner

11   Armstrong or Peter Murphy ever made any of this

12   information public?

13        A    I don't know that personally, no.

14        Q    Okay.  When you indicated that the two of

15   them facilitated -- maliciously permitted or

16   expressly facilitated the publication and

17   distribution of this newsletter, you don't know

18   that, do you?

19        A    Well, by what I said before, I believe

20   that they did.

21        Q    How do you figure that they expressly

22   facilitated the publication and distribution?

23        A    By allowing it to continue and keeping it

24   inside a facility where it is passed back and

25   forth.

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

7/10/2003                                                          Teresa Trainor

Page 113

1      Q    Is it accurate that you first learned of
2   this newsletter when it was sent to your home?
3      A    Yes.
4      Q    What did you do when you received that at
5   your house?
6      A    I cried.
7      Q    Other than crying, what did you do?
8      A    I told my daughter that none of this was
9   true and that I work in a horrible environment.
10  And then I went to the Yellow Pages and looked for
11  someone to help me.
12     Q    And you called a lawyer; is that right?
13     A    That's correct.
14     Q    Who else did you call?
15     A    No one.
16     Q    Who did you tell about this other than
17  your lawyer?
18     A    My family.
19     Q    Okay.  Who's your family?
20     A    My children and my husband.
21     Q    Okay.  Now, in paragraph 10 you indicated
22  that Armstrong and Murphy --
23     A    I'm sorry, paragraph 10?
24     Q    Yes.  You indicated that they intended,
25  that those two men intended to cause you severe

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Case 3:02-cv-01230-AWT   Document 17-3   Filed 01/05/2004   Page 21 of 33
Trainor vs State of Ct./DOC
7/10/2003
Teresa Trainor

Page 114

1    emotional distress?

2          A    Yes.

3          Q    Do you believe as you sit here today that

4    those two men personally intended to cause you

5    intentional emotional distress?

6          A    Yes.

7          Q    And how do you back that up?

8          A    By not taking care of this prior to any

9    of this happening.

10         Q    How do you figure that they could have

11   known that this letter would have been written?

12         A    Prior letters have been written.

13         Q    And do you know that they never did

14   anything about it?

15         A    If they had, they did a poor job of doing

16   something about it, didn't they?

17         Q    Let me ask you something:  How would you

18   eradicate an underground newspaper in any given

19   facility?  Do you have any ideas on that?

20         A    How would I do it?

21         Q    Yes.  Yes.  Give me your thoughts, how

22   would you do that?

23         A    I don't know.  I'm not a warden.  I don't

24   know what's available to them to take care of

25   things like that.  So I would have no way of

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Page 115

```
1    answering it.
2         Q    Why don't you try; you work in a
3    facility --
4         A    No.  I won't try --
5              MR. RANDOLPH:  Objection.  You're
6              asking her to assume a supervisory
7              responsibility which she doesn't have.
8              It's going to be irrelevant.
9    BY MS. EMONS:
10        Q    You may answer the question.
11        A    I won't.  I don't know.
12        Q    Well, you have to because this is your
13   deposition.
14        A    How can I answer a question when I don't
15   know what they have available to them?  I don't
16   know.
17        Q    Well, what are your thoughts on that?
18   What do you suppose they have available to them?
19        A    I have no idea.
20             MR. RANDOLPH:  I'm going to object.
21             It's argumentative at this point.
22   BY MS. EMONS:
23        Q    Let's start again.
24        A    Okay.
25        Q    You make the allegation that they
```

Trainor vs State of Ct./DOC

7/10/2003                                              Teresa Trainor

Page 116

1    intended to cause you severe emotional harm because

2    they did nothing; and if they had done something,

3    clearly, this newsletter would not have come out.

4    I asked you what do you believe they have available

5    to them.  Let me ask you that question:  What

6    sources do you believe that they have available to

7    them that they neglected to follow through?

8         A    They have a security division, they have

9    captains, they have the state police.  They have

10   several things that are available to help find the

11   people:  their officers and/or lieutenants and/or

12   captains and/or wardens.  Whoever is publishing

13   this trash, they have the backing to find these

14   people and to eliminate them from their positions

15   in a state correctional facility.

16        Q    How do you figure they can find out who

17   is disseminating an underground newsletter?

18              MR. RANDOLPH:  Objection.

19              Argumentative.

20   BY MS. EMONS:

21        Q    It's not argumentative.  You can answer

22   the question.

23        A    I don't know.

24        Q    One thing you neglected to say in your

25   list of --

Brandon Smith Reporting Service

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Page 117

1              MR. RANDOLPH:  Objection.  This is

2         not a question.

3    BY MS. EMONS:

4         Q    One of the things that you neglected to

5    indicate -- I'm going to ask a question -- is you

6    claim that the lieutenant's and captains and people

7    who are providing this information, is it at all

8    possible that the people who provided this

9    newsletter were correction officers?

10        A    I have no idea.

11        Q    Okay.  But you neglected to claim that

12   officers could have been responsible?

13        A    You asked me a question.  I tried to

14   answer it.

15        Q    Is it possible that correctional officers

16   disseminated this underground newsletter?

17        A    It's possible.

18        Q    Okay.  Same way as it could have been

19   anyone else?

20        A    Yes.

21        Q    You have no personal knowledge of any of

22   it?

23        A    Right, as I stated before.

24        Q    And you are aware that the state police

25   came --

Trainor vs State of Ct./DOC

7/10/2003

Teresa Trainor

Page 126

1    know?

2        A    Six dollars.

3        Q    No. 18, the Workers' Comp claim, I had a

4    question about that; but that was as a result of

5    the simulation?

6        A    Yes, ma'am.

7        'Q    Okay.  Now, I was amused by your response

8    to No. 19 where you claim losses of a million

9    dollars for emotional distress.

10              MR. RANDOLPH:  Objection.  That is

11              not a question.

12    BY MS. EMONS:

13        Q    Would you please tell me how you get to

14    that figure?

15        A    As I stated before, I don't think you

16    could put a figure on someone's emotional

17    well-being or the look on their daughter's face

18    when she opened something like that.  I respect my

19    kids beyond anything else in my life.  My fourteen-

20    -- well, she'll be sixteen -- -year-old daughter

21    is -- she's a very intelligent young lady.  To have

22    someone put this into publication about her

23    mother's sexual behavior is not something that I

24    ever, ever want to come into my home.

25        Q    Let me ask you a question --

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

7/10/2003                                                    Teresa Trainor

Page 127

1        A      Nothing can make that -- no amount of

2    money.  And the fact that the department doesn't

3    stop this, no amount of money can change it.

4        Q      Let me ask you a question.  You don't

5    think for a minute that Commissioner Armstrong sent

6    that letter to your house, do you?

7        A      I have no idea.

8        Q      Do you have any personal knowledge that

9    he sent that letter to your house?

10       A      I have no idea.

11       Q      I'm asking you for a yes or no answer?

12              MR. RANDOLPH:  Objection.

13              THE WITNESS:  I said I don't know.

14   BY MS. EMONS:

15       Q      Do you have any personal knowledge that

16   Warden Murphy put that into the mail and sent that

17   to your house?

18       A      No.

19       Q      Okay.  Do you have any personal

20   information that Armstrong knew or instructed

21   anyone to send that letter to your house?

22       A      No.  I don't have personal connections

23   with those people.

24       Q      And do you have any personal knowledge

25   that Peter Murphy either knew that someone was

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Page 128

```
 1    going to send that to you or instructed anyone?

 2         A    No.  No.

 3         Q    Okay.  You indicated that you got to

 4    Susan Stremien through EAP?

 5         A    That's correct.

 6         Q    How did you get to EAP?

 7         A    I called.  They give you a number to

 8    call.

 9         Q    And when did you call EAP?

10         A    Right after the incident happened, the

11    simulation.

12         Q    Okay.  So your connection through EAP had

13    nothing to do with the receipt of the letter; is

14    that correct?

15         A    No.  I had seen them prior to that

16    because of the simulation.

17         Q    Okay.  So you called EAP, and they sent

18    you to a doctor?

19         A    Some guy.

20         Q    And what guy is that?

21         A    It's down on Route 6.  I don't know the

22    name of the group.  It's a group.

23         Q    How many times did you see that guy?

24         A    I believe you can only see him twice,

25    then he sends you someplace else.
```

Trainor vs State of Ct./DOC

7/10/2003                                                      Teresa Trainor

Page 129

1               MS. EMONS:  Would you mind getting

2          me that, too?  I don't even have a name.

3               THE WITNESS:  I don't -- and you

4          know what, Kevin, I don't even know the

5          name of that.

6     BY MS. EMONS:

7          Q     You can get it through EAP.

8          A     I'll have to look.

9          Q     Okay.  Other than all the people we've

10    spoken about today, is there anyone else that's

11    treated you during the last ten years?

12         A     No.

13         Q     Any other doctors other than Dr. Harris

14    for anything medical, either?

15         A     No.

16         Q     So it's Harris, Powell, Stremien, whoever

17    this guy is --

18         A     Yes.

19         Q     -- a referral from EAP, and Alicia Fagin?

20         A     Right.

21         Q     Am I right about that?

22         A     Yes.

23         Q     Anybody else?

24         A     No.

25         Q     You were transferred to Bergin; was that

Trainor vs State of Ct./DOC

Page 132

1    being taken out in an ambulance.

2          Q    Right.  And once you're out of the

3    facility and then submit paperwork, are you aware

4    what the procedure is?

5          A    It's to go back to the facility and

6    complete the paperwork with your supervisors.

7          Q    Okay.  So your transfer request to Bergin

8    had absolutely nothing to do with the receipt of

9    this particular newsletter; is that correct?

10         A    That is correct.

11         Q    You had requested the transfer prior?

12         A    Yes, I did.

13         Q    And was there any question as far as them

14   giving you the transfer that you're aware of?

15         A    Yes, there was.

16         Q    What was the question?

17         A    Because there were senior people before

18   me to go to Bergin.

19         Q    Okay.  And what took place as a result of

20   that?  How did that interfere with your transfer?

21         A    Somebody had to be bumped before I could

22   go up there, another officer.

23         Q    Okay.  And that happened before you came

24   back on Comp; is that right?

25         A    It happened, yes.  What they did to make

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

7/10/2003                                                          Teresa Trainor

Page 143

1         A     No.

2         Q     Okay.  Bear with me.  Let me just get a

3    couple of dates down, if I can, again.  You went

4    out on Comp in October, early October?

5         A     Yes.

6         Q     When -- after the simulation?

7         A     Yes.

8         Q     And you left the facility right after

9    that; am I right about that?

10        A     Yes.

11        Q     Did you go to the hospital at all?

12        A     No.  I went home.

13        Q     You went directly home?  Who authorized

14   you to go home, do you remember?

15        A     No, I really don't know.

16        Q     I'm assuming you asked permission to go

17   home, and they said fine?

18        A     Yes.  I don't remember who did that.

19        Q     Okay.  Do you remember what day it was

20   that the newsletter came to your house?

21        A     It was -- no, I don't know the exact

22   date.  But I know it was, like, the third week of

23   October.

24        Q     And you never told anyone at DOC that you

25   received the newsletter?

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

7/10/2003                                                    Teresa Trainor

Page 147

```
1        Q    No.

2                    MR. RANDOLPH:  No.  Well --

3                    MS. EMONS:  Is it under there?  Yes,

4             that's it.

5                    MR. RANDOLPH:  That's it.

6   BY MS. EMONS:

7        Q    Okay.  You indicated on page 3, is it --

8   that's my fax.  I may not -- no, actually, you may

9   have a page 3.

10            I asked you to indicate all the times and

11  dates when these events took place between Baker

12  and Waterman.  Coming down to just about here, 9c,

13  for example, it says C.O. Waterman and C.O. Baker

14  made vulgar and sexually explicit remarks towards

15  the plaintiff.  And I asked for the dates, and it

16  indicates that dates are unknown.  What remarks did

17  they make to you other than the ones that you've

18  already told me about?

19       A    I told you about the one with the white

20  girl.  With Waterman, it's like a daily thing about

21  being a female and, Oh, you got that post because

22  you did -- and he would always refer back to

23  Carlone.  And --

24       Q    And you have no idea about the dates?

25       A    No, I really don't.  I mean --
```

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

7/10/2003                                                    Teresa Trainor

Page 148

1         Q    And you never brought it to anybody's

2    attention; is that right?

3         A    Right.

4              MS. EMONS:  Okay.  Hang on one

5              second.  I may be missing a page here.

6              Do you have a page 4?  Okay.  I may be

7              missing a page here.  I'm missing a page

8              6.  What concerns me -- I'm missing page

9              4.  Hang on one second.  Let me see if

10             it's in here.

11             Yep.  Okay.  Let me go through this

12             with you so I can get it on the record.

13             I think I'm all set for now.

14

15                  CROSS-EXAMINATION

16   BY MR. RANDOLPH:

17        Q    Mrs. Trainor, I'll ask you a couple of

18   questions based on the questions that were

19   propounded this morning by Attorney Emons.

20             The simulation occurred in the year 2001;

21   is that right?

22        A    That's correct.

23        Q    And also, the newsletter appeared and was

24   mailed to your house in 2001; is that right?

25        A    That's correct.

Brandon Smith Reporting Service

5d99102b-827a-4d4a-bdbd-a3c5643dca2a

Trainor vs State of Ct./DOC

Page 154

1          Q     Did anyone else find it offensive that

2     you know of?

3          A     I don't know.  I don't discuss those

4     types of things with people.

5          Q     Okay.  After you left Hartford and went

6     to Bergin, who of your co-workers do you see on a

7     daily basis?

8          A     On a daily basis, no one.

9          Q     Who do you communicate with on a daily

10    basis?

11         A     I used to with Robin DeCarli.

12         Q     Until she died, right?

13         A     Yep.

14         Q     And that was a motorcycle accident?

15         A     Yes.

16         Q     Where did that happen?

17         A     Massachusetts, on 91.

18         Q     So you have had no contact since October

19    of 2001 with Marion Baker; is that right?

20         A     No.

21         Q     You've had no contact with Waterman since

22    2001?

23         A     No.

24         Q     You've had no contact with virtually

25    anyone who you used to work with at Hartford since

5d99102b-827a-4d4a-bdbd-a3c5643dca2a