3

EXHIBIT B

# Commission on Human Rights and Opportunities

## FACT-FINDING REPORT

### into

### Allegations of SEXUAL HARASSMENT within the Department of Correction

**FEBRUARY 2003**

## **EXECUTIVE SUMMARY**

In the past year, employees at the State of Connecticut Department of Correction (DOC) have raised allegations of sexual harassment at DOC and they have also claimed that DOC's Affirmative Action Unit (AAU) has been ineffective in investigating and resolving internal sexual harassment complaints. Victims of sexual harassment at DOC, and various advocacy groups—including the Permanent Status on the Commission of Women (PCSW), the Connecticut Sexual Assault Crisis Services (CONNSACS), the Connecticut National Organization for Women (CT NOW), the Connecticut Women's Education and Legal Defense Fund (CWEALF) and various unions—have coordinated efforts over the past several months seeking systemic changes in DOC's response to and resolution of sexual harassment complaints. In response to these concerns, the Commission on Human Rights and Opportunities (CHRO) initiated its own investigation and joined the Connecticut General Assembly's Labor and Public Employees Committee (Labor Committee), and other interested groups, in reviewing and analyzing allegations of sexual harassment at DOC.

Over time, confidence in DOC's sexual harassment complaint process has diminished. This is due to a variety of interrelated factors, namely:

- Misunderstanding and misapplying the legal standards applicable to sexual harassment;

- Failing to adequately discipline individuals who were found to have engaged in conduct prohibited by DOC's sexual harassment policy;

- Sometimes punishing or threatening to discipline the victim for failing to report the harassment on the date it occurred, and/or inappropriately conducting an independent investigation of the victim;

- Assigning sexual harassment complaints to the Security Division (SD) or others untrained in sexual harassment investigations;

- Unacceptably delaying beginning and completing investigations; and

- Retaliating against victims for having reported sexual harassment.

Together, these factors have an intimidating effect on a victim's willingness to come forward with a complaint of sexual harassment. Further, most of the investigation files CHRO reviewed were seriously flawed. In addition, there is no effective completion of an internal investigation once the complaining party files a

iii

CHRO and/or Equal Employment Opportunity Commission (EEOC) complaint. Competent oversight, and meaningful consequences for engaging in sexual harassment, cannot be achieved without conducting thorough and complete investigations. This is particularly important when the complainant abandons the complaint or files in a different forum.

Based on a thorough review of the record, CHRO finds that sexual harassment is pervasive at DOC. CHRO also determined that DOC does not strictly comply with CHRO's Affirmative Action (AA) Regulations. As a result of its investigation and findings, CHRO has fashioned recommendations designed to make DOC's complaint process more legally sufficient, fair, meaningful and effective. A comprehensive list of recommendations may be found in § VII at 74. The following are the most notable:

- DOC should modify its sexual harassment policy to address the concerns highlighted in this report, and to comply with state and federal laws and regulations;

- DOC should thoroughly investigate each sexual harassment and retaliation complaint;

- DOC should appropriately discipline those individuals found to have violated its sexual harassment policy; and

- DOC should effectively train its employees on sexual harassment and vigilantly enforce a zero tolerance policy.

These systemic changes—if implemented—will effectively translate into genuine and consistent treatment of the issue of sexual harassment throughout DOC. Only a strong commitment evidenced by the Commissioner and his administration taking appropriate action to eliminate sexual harassment in the workplace can effectively change the culture and ensure that DOC is a safe place for women to work.

I.  **INTRODUCTION**

Allegations of widespread sexual harassment at DOC came to the attention of CHRO in the spring of 2002.[1] In response thereto, on June 3, 2002, the Labor Committee held a meeting at which a number of women told their stories of sexual harassment, and DOC Commissioner John Armstrong responded. Tape recordings of that meeting have been transcribed and those transcripts are part of CHRO's record.[2] Amalia Vazquez Bzdyra, CHRO's chairperson, and Cynthia Watts Elder, CHRO's Executive Director, wrote to Senator Edith Prague, Chair of the Labor Committee, and Leslie Brett, the Executive Director of PCSW, on June 5, 2002, offering the CHRO's support in working collaboratively toward a satisfactory resolution of the sexual harassment issues at DOC.

At CHRO's regular meeting on June 13, 2002, on the motion of Commissioner Edith Pestana, the Commissioners unanimously voted to conduct a public fact-finding hearing. This vote occurred after Commissioner Armstrong and Leslie Brett updated CHRO about the sexual harassment issues at DOC, and invited CHRO to contribute its expertise to resolve the issue.

The Labor Committee held a public hearing on July 10, 2002 to invite testimony on the issue of sexual harassment at DOC. Commissioner Armstrong testified first, followed by some of the women who had filed sexual harassment complaints (as well as their representatives, women's advocates, and others). The transcript of that proceeding is also part of this record.[3] On August 8, 2002, a number of women filed two lawsuits in federal court alleging widespread sexual harassment at DOC.[4]

On September 26 and October 10, CHRO held public fact-finding hearings. The hearings were authorized by, and held in accordance with, CONN. GEN. STAT. § 46a-54(9) and CONN. AGENCIES REGS. § 46a-54-16 (1993). CHRO heard over 20

---

[1] Although throughout this process CHRO learned of concerns related to discriminatory treatment of other protected classes, this report is limited to CHRO's investigation regarding sexual harassment.
[2] See Appendix A. References to the transcripts shall be Tr. #__.
[3] Id.
[4] Nancy Orr, et al. v. State of Connecticut, Dept of Corrections, et al., No. 3: 02 CV 1368 (AHN); and Maureen Allen, et al. v. Armstrong, et al., No. 3: 02 CV 1370 (AHN) (The latter potentially includes any current and/or former female DOC employees.). The parties are actively involved in settlement negotiations. See Appendix H.

1

hours of testimony from over 30 witnesses, accepted written testimony, and received numerous exhibits into the record.[5]

## II. AUTHORITY AND PURPOSE OF FACT-FINDING HEARING AND REPORT

### A. Statutory/Regulatory Authority

CHRO's authority to conduct fact-finding hearings derives primarily from CONN. GEN. STAT. § 46a-54(9), which provides:

> By itself or with or by hearing officers or human rights referees, to hold hearings, subpoena witnesses and compel their attendance, administer oaths, take the testimony of any person under oath and require the production for examination of any books and papers relating to any matter under investigation or in question.

CONN. AGENCIES REGS. §§ 46a-54-16 through 46a-54-18 (1993) enhances the statutory authority. For example, § 46a-54-16(b) states:

> The Commission may conduct fact-finding hearings for the purpose of: ... (b) compiling facts concerning discriminatory practices, discrimination in employment, violation of civil liberties and other related matters.

In addition, this authority to conduct fact-finding hearings relates to other powers and duties of CHRO found in CONN. GEN. STAT. §§ 46a-54 and 56. In particular, § 46a-54(7) grants CHRO the power and duty:

> To recommend policies and make recommendations to agencies and officers of the state and local subdivisions of government to effectuate the policies of this chapter.

Following the hearings, CHRO is authorized to issue a report, pursuant to CONN. AGENCIES REGS. § 46a-54-18 (1993):

> Within a reasonable time after the conclusion of a fact-finding hearing(s), the Commission may prepare a report of the hearings containing the facts found and its recommendations. Such report, if prepared, may be submitted to the Governor, the General Assembly and to interested individuals and organizations. Fact-finding reports shall be public documents and available to interested members of the public free of charge.

### B. Historical Perspective

CHRO has used its fact-finding authority on several occasions in the past. For example, in response to a number of hate crimes including cross burning and swastika paintings on synagogues and other buildings, CHRO conducted a series of

---

[5] See Appendix A.

2

fact-finding hearings on racial and religious violence in late 1979, and issued a report of its findings. Public Act 80-54 resulted from CHRO's legislative recommendations made in its fact-finding report. This Public Act added protections regarding the desecration of property and the burning of crosses on private property. CHRO also conducted hearings on allegations of discriminatory real estate practices, economic development and contract compliance matters in the 1980's.

More recently, there were fact-finding hearings in 2000 concerning the hiring and retention of minority teachers and administrators in the Waterbury School District. There was also a fact-finding hearing on allegations of racial discrimination at the Department of Children and Families. Most recently, CHRO held fact-finding hearings relating to DOC's transfer of inmates to Virginia.

### III. SCOPE OF PROCEEDINGS

#### A. Formal[6]

As previously noted, on June 3, 2002, the Labor Committee conducted a public meeting concerning complaints of sexual harassment at DOC, at which it heard from a number of interested individuals.[7] At CHRO's June 13, 2002 regular meeting, the Commissioners unanimously voted to conduct a public fact-finding hearing. The Labor Committee subsequently conducted a formal hearing on July 10, 2002, at which many people testified.[8]

In preparation for the fact-finding hearings, CHRO legal staff reviewed DOC's internal investigation files of sexual harassment complaints to gain an understanding of the depth and severity of the allegations, and to evaluate how the Affirmative Action Unit (AAU) responded thereto. CHRO examined approximately 150 files dating back ten years at DOC's central office on September 19, 24, and October 7, 2002.[9]

On August 2 and 30, 2002, CHRO sent to DOC a total of 70 questions including requests for documents. DOC responded to CHRO's first request on September 26,

---

[6] The information gathered during the formal process is summarized in § V.
[7] See Appendix J.
[8] Id.
[9] Having reason to believe that there were more files to review, CHRO submitted a Freedom of Information Request for any files closed since September 26, 2002, and named others that it learned about subsequent to having reviewed the files at DOC. DOC then produced another approximately 35 files for CHRO's review.

3

2002, and the second request on October 9. In its responses, DOC supplied approximately 90 documents.[10]

CHRO invited a number of people to attend the fact-finding hearings held on September 26 and October 10, 2002. Included on CHRO's invitation list were a number of individuals from DOC. CHRO subpoenaed certain DOC employees, and encouraged DOC to produce any other witnesses it desired.[11] CHRO also invited ten individuals whose CHRO sexual harassment complaints against DOC were then pending at CHRO. The transcripts and other evidence from these hearings are available to CHRO investigators in the course of their investigations of individual complaints. As stated during the proceedings, however, *neither the fact-finding hearings nor this report will resolve any of the individual complaints.* The formal proceedings concluded with the CHRO fact-finding hearings conducted at the Legislative Office Building.

### B. Informal[12]

In addition to gathering information through the formal process, CHRO also received materials informally from various sources regarding the current disciplinary process and issues related to sexual harassment offenses, past and present. That material included: letters and/or various packets of materials from past and present employees, and other documents from—as well as telephone conversations with—DOC current and former employees. For example, CHRO received correspondence from an inmate whose wife was allegedly harassed by a male correction officer (CO), and from the girlfriend of an inmate who also claimed she was harassed by another male CO while visiting her boyfriend. In each instance, the two women complained that the male COs had ogled them, and made sexually inappropriate comments to and about them. *Although DOC conducted an investigation into each complaint, neither was characterized as a sexual harassment complaint.* As to the first complaint, DOC's investigation concluded that the claims were unsubstantiated, notwithstanding corroborative evidence in the file. More troubling, however, was DOC's transfer of the second inmate two months *after* the male CO's sexual harassment was reported to

---

[10] See Appendix A.
[11] CHRO issued subpoenas to secure the attendance of individuals who otherwise would not agree to testify voluntarily.
[12] All documents referenced in this section are listed in Appendix A.

4

DOC. According to the inmate's girlfriend, this transfer resulted in a severe hardship to them.[13]

Unfortunately, DOC's present policy against sexual harassment does not extend to visitors and/or family of inmates.[14] In CHRO's opinion, DOC's policy should include a prohibition against sexual harassment of visitors and/or family members of inmates. Such complaints must be taken seriously and processed in the same manner as complaints by DOC employees.[15] Additionally, CHRO recommends that management monitor responses to such complaints to ensure that neither the affected inmates nor their visitors are retaliated against for having complained of sexual harassment.

To gain understanding of the prison environment, CHRO staff and commissioners, accompanied by DOC personnel, toured a few DOC facilities. On November 1, 2002, CHRO visited Corrigan-Radgowski Correctional Institution (CI) and York CI. Later on November 13, CHRO toured Hartford Correctional Center and MacDougall-Walker CI.

CHRO continued to receive information from various sources as this report was being prepared. For example, Senator Prague, in a November 25, 2002 letter to Commissioner Armstrong, reported learning about: DOC assigning the Security Division (SD) to investigate an AAU complaint, an AA Investigator interviewing a witness while another witness was present, reports of "shadow files" (unofficial personnel files) maintained at DOC, and a sexual harassment training session where the trainer (a DOC employee) asserted that the plaintiffs in the federal lawsuits were

---

[13] See generally § IV. A. discussing rights of non-employees to be free from sexual harassment.
[14] On July 11, 2002, CHRO provided DOC with a model sexual harassment prevention policy. This policy expressly protects nonemployees from sexual harassment. Specifically it states: "It is [the employer's] policy that all employees, and volunteers and parties have a right to work in an environment free of discrimination, which encompasses freedom from sexual harassment."
[15] Carl Jordan, an AA Investigator, testified that the AAU *does* investigate sexual harassment complaints by one class of nonemployees: inmates. See Jordan's testimony on October 10, Tr. 57-63. (The AAU files CHRO reviewed, however, show that Jordan rejected at least one inmate's AA complaint because of his status as an inmate.) By contrast, however, the AAU does *not* investigate complaints that employees have been sexually harassed by inmates. Id. See also DOC's response to written questions dated September 26, 2002, #9 wherein DOC explained that inmate conduct is governed by AD 9.5. There is no convincing reason that AAU should be prohibited from conducting a parallel investigation into claims that an inmate's conduct violated an employee's right to work in a workplace free from discrimination. In fact, it is especially important for AAU staff to investigate to identify such problem inmates and, perhaps more importantly, identify staff who may not have fulfilled their responsibilities to protect such employee from an inmate's sexually harassing conduct.

5

only interested in money and stated that it was inappropriate for them to seek money damages.

Further, on November 12, 2002, CHRO received an anonymous letter addressed to Governor John Rowland, with an attached memorandum from Maria Houser, former DOC Deputy Commissioner, to Commissioner Armstrong, alleging that remarks made by Deputy Commissioners Dennis Coyle and Jack Tokarz exhibited indifference toward Hispanics and women.[16] The anonymous writer continued:

> It is common knowledge among the "rank and file" that within the agency, there is an internal struggle among Senior Administrators not only for "power" but also how to handle and address the problems of sexual harassment and racial discrimination. One group is struggling to keep it a secret, to hide the fact that their incompetence has created a major issue. The other group wants to expose it and address it in order to resolve the problem.

In response to Houser's testimony that Commissioner Armstrong joked about a phallic object called "Brutus," a current DOC employee wrote to CHRO confirming its alleged existence. According to the letter, a warden who took the object out of the trunk of a state car showed it to that DOC employee. The warden allegedly called the phallic object "Brutus" and said it was a trophy from York CI, the women's facility.

In response to mounting criticism of DOC's handling of sexual harassment issues, in a letter to Attorney General Richard Blumenthal dated October 22, 2002, Governor Rowland wrote:

> I am concerned, however, that pending CHRO's final report, DOC employees may need an independent person or office to turn to with complaints. Therefore, I am asking you to temporarily assign staff to investigate and respond to sexual harassment complaints filed within DOC. Furthermore, I am asking you to conduct an independent evaluation of the DOC Affirmative Action Unit and to make recommendations for the improvement of the complaint process.

Attorney General Blumenthal replied on October 25, 2002, pledging to work with "agencies that have expertise and experience in this area to immediately establish an independent process for reviewing and investigating claims of sexual harassment by DOC employees." He indicated that his office was working on improving DOC sexual harassment policies and procedures as part of an ongoing federal mediation process.[17]

---

[16] See testimony of Maria Houser at CHRO fact-finding hearing October 10, Tr. 206-207.
[17] See n. 5.

The Attorney General's Office (AG's Office), PCSW and DOC signed a Memorandum of Understanding (MOU) regarding the interim investigation of internal complaints of sexual harassment at DOC, effective January 24, 2003.[18]

Another example of problematic behavior at DOC includes a UCONN Health Center employee working in a DOC facility who, in a December 16, 2002 letter to CHRO, complained about the handling of her sexual harassment complaint. Specifically, a copy of her complaint, lodged with UCONN's Office of Diversity, was given to the perpetrator in apparent violation of confidentiality provisions. Moreover, apparently only a select group of women, mainly friends of the perpetrator, were interviewed. The Complainant was not asked about potential witnesses. She indicated that her complaints continue largely unanswered and that she experiences daily hostility at work.

Throughout the months CHRO has been involved in investigating and preparing its report, incidents of sexual harassment at DOC continued to be reported in the news. For example, on October 25, 2002, the <u>Hartford Courant</u> reported that the warden at the Hartford Correctional Center and one of his majors had been placed on administrative leave after being accused of sexual harassment. According to the news article, Warden Nelvin Levester was placed on leave after he allegedly asked his secretary if she would have sex with him or someone else for one million dollars. Further, Major (Maj.) Donald Guilbert was reported to be the subject of three separate complaints from three female staff members. According to DOC records, Guilbert had been accused of sexual harassment in the past.

Additionally, in its December 26, 2002 edition, the <u>Hartford Advocate</u> published an article about the treatment of female visitors to inmates at DOC facilities. Titled "Vulgar Visits," it recounted stories of several women who alleged that DOC employees verbally harassed them because of sex, race and size. According to the article, the harassment was not limited to one facility.

Another news account at WFSB.com, on January 3, 2003, reported the arrest of a DOC employee, Darryl Watkins, for alleged sexual assault.[19] According to the media, Watkins had earlier been convicted for sexual assault in the early 1980s.

---

[18] The MOU terminates ninety days from the effective date thereof unless extended, or unless the parties agree to terminate it earlier. <u>See</u> Appendix K.
[19] It is unclear from the news account whether Watkins was employed by DOC at the time of his arrest.

7

Based on careful review of DOC's response to allegations of sexual harassment, CHRO has reason to believe that the code of silence continues to exist at DOC.[40] It is important to note that DOC is not the only paramilitary organization that faces these challenges.

Although not necessarily denoted as such, sexual harassment of co-workers (especially subordinates) could be characterized as "abuse of authority." The U.S. Department of Justice conducted a national survey of police officers about their attitude related to abuse of authority. Although this survey relates to police officers, due to the similar work environment, two of the key findings are applicable here:

1) Training and Education are effective ways to reduce police abuse;

2) A department's chief and first-line supervisors can play an important role in preventing police from abusing authority.

National Institute of Justice "Police Attitudes Toward Abuse of Authority: Findings from a National Study" (Washington D.C.: May 2000). Thus, effective training and strong leadership could decrease the incidents of the code of silence in response to sexual harassment complaints.

As the summary findings show, some victims and witnesses who broke the code of silence were retaliated against by DOC. (See e.g. testimony of Sharon Brown Thomas at October 10, 2002 fact-finding hearing at Tr. 110.) The survey regarding abuse of authority within police departments shows results consistent with the womens' concerns regarding retaliation by DOC.

For example:

- 67.4% indicated that officers who do report misconduct are shunned by their co-workers;

- 52.4% agreed that it was common for officers to "turn a blind eye" to the improper conduct of other officers, including serious criminal offenses; and

- 24.9% of those surveyed claimed that whistle blowing is not worth it.

---

[40] As the reader will later see, in the case of VB, although she alleges that sexual harassment took place in a room full of (male) co-workers, when interviewed not one could recall having seen or heard the conduct complained of. The investigator concluded as follows: "I am of the opinion that some form if not all of the alleged incidents in the complaint did in fact occur. I found several of the witnesses to be less than forthcoming, evasive, contrary, collusive, and uncooperative." See § V. A.

<u>Recruiting and Retaining Women</u>, *supra*, 3-4.

> As recommended by the National Center for Women and Policing, agencies must take effective measures to overcome the code of silence.
>
> The policy about cooperating with investigations must be enforced and disciplinary action taken as needed. Officers who report misconduct must be protected from retaliation and rewarded for living up to the agency's standards. Officers who "can't remember," "didn't see" or "didn't hear" things they were in a position to observe are probably not good candidates for investigative or specialty positions. Even if they are being completely honest, these positions require candidates whose perceptual abilities and long-term memory are superior. In fact, if the facts of a case demonstrate a complete failure to satisfactorily perform duties, it should raise the questions of whether the employee should be sent for professional evaluation, removed from specialty investigative positions, demoted, or separated from the agency on fitness grounds.
> *Officers who do not cooperate in investigations should not be given consideration for promotions.* Breaking the code of silence is not easy, but is an issue that all law enforcement administrators must face.

<u>Id</u>. at 153 (emphasis added).[41]

Even though the corrections environment is harsher than an office workplace, employees are still guaranteed the right to be free from harassment. According to the EEOC:

> In general, a woman does not forfeit her right to be free from sexual harassment by choosing to work in an atmosphere that has traditionally included vulgar, anti-female language.
> The reasonable person standard should consider the victim's perspective and not stereotyped notions of acceptable behavior. For example, the [EEOC] believes that a workplace in which sexual slurs, displays of "girlie" pictures, and other offensive conduct abounds can constitute a hostile work environment even if many people deem it to be harmless or insignificant.

EEOC's <u>Policy Guidance on Current Issues of Sexual Harassment</u>, (March 19, 1990)(citations omitted).

When CHRO visited the various facilities, not only did Commissioner Armstrong accompany CHRO, but so did the Deputy Commissioners, Wardens, Lead Wardens, and Captains within the facility. Some Union Stewards and sexual harassment

---

[41] <u>See also</u> Commissioner Armstrong testified at the Labor Committee's public hearing on July 10, 2002: "[S]taff are expected to report any violation of ADs, policies or rules, by the end of their tour of duty on that day." Tr. 11. <u>See</u> Appendix A.

18

victims informed CHRO staff that the presence of the high ranking escorts intimidated certain DOC employees who were thus reluctant to be seen speaking with CHRO.

Further, and perhaps most troubling, was CHRO's discovery that DOC may have made unavailable individuals who otherwise would have spoken to CHRO during CHRO's visit. Conversations with various DOC employees suggest that some individuals were abruptly reassigned to duties outside the facility on the day of CHRO's visits so that they would not be available to talk with CHRO.

Prior to visiting Hartford Correctional Center on November 13, 2002, CHRO specified the name of an individual to be released to talk with CHRO. CHRO later learned that DOC had suspended her. She subsequently informed CHRO that she had been notified on October 23, 2002, that she was suspended for an act which took place the previous March. During the visit, DOC never disclosed the reason for her unavailability. CHRO's letter, dated November 19, 2002, seeking an explanation for her absence has gone unanswered by DOC. Such actions imply that DOC may not want CHRO to fully investigate complaints of sexual harassment at DOC.

The foregoing strongly suggests a culture at DOC that tolerates sexual harassment against women. As a result, DOC should be more vigilant in securing a workplace free from sexual harassment, and monitoring the workplace to protect victims against sexual harassment.

Law enforcement experts agree that strong leadership is critical to a department's effective operation. The following quote, although it specifically references police departments, is especially apt for DOC's present situation:

> [T]he chief is the main architect of police officers' street behavior. This is so because the strength and direction of street-level police peer pressures ultimately are determined by administrative definitions of good and bad policing and by the general tone that comes down from the top.

Jerome H. Skolnick and James J. Fyfe, Above the Law: Police and the Excessive Use of Force (New York, NY: The Free Press, 1993) 136. Now more than ever, DOC needs strong leadership to set the example that sexual harassment will no longer be tolerated at DOC.

These individual complaints demonstrate dramatically how pervasive sexual harassment is at DOC, and how inadequate DOC's response (especially the AAU's) has been to date.

**B.     CHRO Complaints[51]**

In addition to reviewing DOC internal complaints, CHRO reviewed the past ten years of closed CHRO complaints alleging sexual harassment filed against DOC.[52] The following represents a sampling of the file review. As with the previous section, these examples were chosen because of the consistency in the allegations, and because they took place in the past five years.

**1.**     In June 2000, AD, a female, filed CHRO complaints against DOC, UCONN Health Center, and MY, a male dentist who was her supervisor. Beginning in December 1999, MY sent AD, at her home, anonymous inappropriate letters (expressing desire for her, commenting on her appearance) and packages from 1-800-FLOWERS. AD felt scared and concerned. She had heard that MY had sexually harassed other DOC women.

AD complained to DOC. DOC suspended MY pending investigation. Ultimately, MY confessed to sending the letters and packages to AD and also to sending similar letters to a female dental assistant a year earlier. The disposition was a ten day suspension without pay, transfer of MY to another facility, psychiatric treatment, and signing a "last chance" agreement that stated any similar conduct in the future would result in his termination.

*Just one year before the above incidents, a female dental assistant filed an incident report because she received similar letters. After filing the incident report, the letters ceased and she apparently withdrew the complaint. DOC conducted no further independent investigation and took no remedial action.[53] MY was not even interviewed, nor was he disciplined (or counseled) for the first offense. One can only speculate*

---

[51] In an effort to protect the confidentiality of parties as much as possible, CHRO has used their initials herein. In the course of preparing this report, CHRO has reviewed all sexual harassment CHRO complaints against DOC. As a result of this review, CHRO has, on its own motion, pursuant to CONN. GEN. STAT. § 46a-94a(c), reopened one complaint due to errors. Additionally, staff identified at least five others that would have been candidates for consideration for reopening but for complainants' requests that CHRO not pursue the reopening process, or for other reasons unrelated to the merits.

[52] CHRO complaints may be resolved in a variety of ways. Some result in a finding of reasonable cause when there is enough evidence for the investigator to conclude that discrimination may have occurred. Others without sufficient evidence result in a finding of no reasonable cause. After their complaints have been pending for 210 days, Complainants may also request CHRO to release its jurisdiction allowing them to file lawsuits in court.

[53] This is a complaint that CHRO staff would have recommended reopening but for AD's decision not to go forward. The recommendation was based, in part, on DOC's failure to investigate AD's complaints of sexual harassment at all. It appears that DOC's policy is *not* to investigate complaints made by UCONN Health employees who work in DOC facilities notwithstanding the fact that the alleged harassment occurred at DOC's worksite.

29

whether the second incident would have occurred had DOC taken prompt, remedial action after the first offense, and disciplined MY appropriately.

    2.    JC, a female registered nurse, worked for the UCONN Health Center in a DOC correctional facility beginning in June 1998. During most of her employment, she worked the third shift.[54] The shift supervisor was Lt. AE, a male. After her hire, Lt. AE would frequently ask JC to go out with him and a group of friends. When she declined, Lt. AE asked her why she would not go out with Black people.

Subsequently, while Lt. AE was on medical leave for several weeks, he frequently telephoned JC at work. Upon his return, and after JC refused to go out with him, Lt. AE became increasingly nasty. When passing her in the hall, Lt. AE pulled JC's hair and made inappropriate comments. Lt. AE told a mentally disabled inmate, in JC's presence, that she might be interested in him. JC filed an internal complaint. Notwithstanding the filing of the complaint, the harassment continued. For example, Officers prevented JC from entering a cellblock by keeping her trapped between a locked entrance and exit door. Lt. AE spoke to other employees about JC and her complaint, causing her to be shunned by co-workers.

JC's internal complaint was not investigated for months after JC filed it, and then only after she filed a CHRO complaint. During this delay, JC was still exposed to Lt. AE, the harassment continued, and she suffered physical and emotional trauma. Eventually, JC took a medical leave of absence. While on medical leave, JC called the AAU several times a week and was told her file was lost, but after she retained an attorney, the file was located. Since Lt. AE remained in the same correctional facility and would have access to JC, coupled with DOC's extensive delay in investigating her complaint, JC ultimately felt compelled to find other employment. She did so, resigning in July 1999.

After an investigation, JC's CHRO complaint resulted in a finding of reasonable cause.

    3.    PK, a female CO for approximately eight years, filed a CHRO complaint against DOC in December 2000. PK alleged that on two different occasions, Lt. P, a male, watched her through the window. On a scheduled break she was making copies in the break room. Lt. P entered and sat on the couch behind her with his legs spread apart and his arms stretched out on the backrest. He asked her what she was copying. When she exited the break room he called her in an intimidating manner, questioning what authority she had to make copies during her break. Moreover, Capt. A, a male, together with Lt. P, had made comments about her uniform, her hair, and her fingernails in a manner "which they thought gave them the authority to leer at [her] breasts, touch [her] hands and intimidate [her] by their rank."

In June 2002, PK amended her complaint to say, among other things, that Lt. P had filed a frivolous complaint against her. PK noted that the AAU, while refusing to

---

[54] Although employed as a nurse for UCONN Health Center, JC worked in a correctional facility, was bound by its procedures and rules, and therefore largely controlled by the DOC. Indeed, after filing her internal complaint, both a UCONN Health Center and a DOC affirmative action officer met with JC. Moreover, the harasser was an employee of the DOC.

30

investigate her complaint, "went to great lengths to investigate Lt. P's allegations." PK noted that it appears that the AAU's only purpose is to protect the offender and make sure that the department's best interest is served. Since she reported the incident, the perpetrator continued to create a hostile environment for her. He took some actions to intimidate her, such as unjustifiably lowering her annual service rating and not allowing her to re-certify in weapons qualifications. PK claims that DOC and its AAU choose to ignore the situation and simply move the guilty offender from one place to another. While investigating Lt. P's complaint against PK, the AAU informed her that they did not have time to investigate her complaint and that she would be better off filing a complaint with CHRO.

In its answer to PK's CHRO complaint, DOC denied PK's allegations of sexual harassment, claiming that the officers were addressing legitimate matters within their supervisory responsibilities. PK requested and obtained a Release of Jurisdiction, allowing her to remove her case from the CHRO and file directly in court.

4. DB, a female Corrections Record Specialist, complained of sexual harassment by Capt. WC, her male Shift Commander, beginning in January 1997. Capt. WC asked DB for dates and made comments that changed from flattering to crude sexual comments. In June 1997, he said to DB, "You know, if '[S]' [a co-worker with whom DB had a relationship at the time] hasn't been there yet, then he won't know the difference if I'm there first. I won't tell. Besides, you may not want him after me anyway."

Although CHRO issued a finding of No Reasonable Cause, after review CHRO legal staff seriously questioned this disposition, and decided against pursuing reopening for reasons unrelated to the merits, in part because of the passage of time.

As in the preceding section, these cases also show the pervasiveness of sexual harassment at DOC, and the serious flaws in DOC's response to complaints of sexual harassment.

C. **Testimony**

The following summarizes the testimony of some of the witnesses who appeared before the Labor Committee. Space constraints prevent CHRO from summarizing the entire transcript.

1. **Labor and Public Employees Committee**
   a. **Public Meeting on June 3, 2002**[55]

**Commissioner John Armstrong**

Commissioner Armstrong began by stating that as a Commissioner, a husband, and a father of a daughter, he would not tolerate sexual harassment at DOC.

---

[55] The transcript of this proceeding may be found at http://www.state.ct.us/chro/metapages/DOC_060202.pdf

31

Referring to AD 2.2, the Commissioner insisted that DOC has not ignored issues of sexual harassment brought to its attention. He admitted that sexual harassment has occurred at DOC, but observed that it also happens in society as a whole.

DOC operates 24 hours a day, seven days a week, and accordingly "[t]here will always be a few who don't understand that sexual harassment is intolerable, mentally cruel, physically threatening and, most importantly, illegal." Tr. 6. The Commissioner reported that DOC has not had more than 20 sexual harassment complaints in a given year since 1995. He underscored the major steps that were undertaken, or are in process of being undertaken, since the issue was brought to Senator Prague's attention in April:

- partnership/training with PCSW;
- showing of "PRIDE from the Top" video addressing the issue to all staff;
- posting of signs about the issue to all staff;
- establishment of women's rest rooms in all facilities;
- addition of three veteran investigators to the AAU;
- revision of AD 2.2, to tighten up the provisions regarding confidentiality and retaliation;
- selection of an "outside recognized investigatory expert" to review the work of and offer recommendations to the AAU;
- establishment of a support group for those who have been affected by incidents of sexual harassment;
- establishment of a Women's Conference on Criminal Justice to increase the role of women in law enforcement;
- distribution of letters to union heads, which represent DOC staff, asking them to partner or take a stand against any kind of sexually inappropriate conduct;
- distribution of a letter to every employee included with paychecks reinforcing the agency-wide sexual harassment policy; and
- distribution of a letter to all staff:
  - allowing victims to file a late complaint of sexual harassment, and
  - agreeing not to discipline victims for failing to report the incidents timely.

He testified that he is proud of DOC, and that he will work to make it better—a professional workplace free of sexual harassment.

**Leslie Brett, Executive Director, Permanent Commission on the Status of Women**

PCSW will be conducting "train the trainer" classes so that DOC can develop the capability to train DOC supervisors. Leslie Brett also said that there is a structural problem in DOC's timeframe for the victims to bring their complaints that needs to be addressed. For example, some victims may try to work things out by themselves, and that they may later realize that there is no way to solve their problems

32

without filing a formal complaint. Then they subject themselves to discipline for not having reported it earlier.

**Alice Pritchard, Executive Director, CT Women's Education and Legal Defense Fund**

Alice Pritchard pointed out that "complaints are only one indication of sexual harassment." Tr. 33. People did not file complaints in the past knowing that the complaints would not be resolved. Pritchard stated that when people start to get results from their complaints, she expects the number of complaints to increase. She emphasized that outside evaluation is an important step for DOC.

**Beverley Brakeman, Executive Director, CT National Organization for Women**

Beverly Brakeman maintained that the evidence that sexual harassment is rampant in DOC is unequivocal and undeniable. "The pervasiveness and seriousness of the allegations that have been made to date point to a department-wide culture of power and control that has left many women, and probably men, feeling threatened and without choice or opportunity." Tr. 34. She urged Commissioner Armstrong to take steps to address sexual harassment, including implementing support groups for women.

**Jamie Mills, Counsel for CT Sexual Assault Crisis Services**

Jamie Mills shared the example where the victim may have at one time consented to some consensual banter, but later makes clear that certain conduct is not welcome. When the conduct continues the victim files a complaint. DOC creates a disincentive to file a complaint when it investigates the victim's background and subjects the victim to potential discipline. The message sent is that by filing a sexual harassment complaint you may subject yourself to scrutiny of your past behavior and face potential discipline.

**Gail Burns-Smith, Executive Director, CT Sexual Assault Crisis Services**

Gail Burns-Smith stressed that "sexual violence occurs on a continuum," including "sexual comments, invasive personal questions or disclosures, unwelcome and repeat[ed] demands for sexual favors, sexual gestures, groping, unwanted touching, indecent exposure, threatening, sexualized anonymous telephone calls," and also rape. Tr. 45. "[S]exual harassment, like rape, is about the abuse of power and control;" it is never asked for and never deserved. Id.

She remarked that "while sexual harassment can and does happen in many work environments, women in traditionally male-dominated occupations are more