likely to be harassed." Id. Further, "research shows that the attitudes and behaviors of male colleagues is a barrier to the advancement of women in non-traditional occupations, including law enforcement and corrections." Tr. 45-46. She said that "sexual harassment threatens women's economic security" and health, and that years of unchecked sexual harassment at DOC have resulted in the loss of qualified women for DOC. Tr. 46. Burns-Smith stated that "DOC has failed to take prompt remedial action," and that the AAU has "failed to perform its statutory duties." Tr. 46-47. During months of meetings with Sen. Prague and others, she has heard numerous reports of sexual harassment, and that "what is striking are the similarities among the individual experiences" such as: the same harassers, the same threatening behavior and conduct, the "same obdurate victim-blaming response from Affirmative Action," and the same fear of the victims that they will be retaliated against. Tr. 47-48.

**Barbara Hawkins, DOC employee and Union Steward**

Barbara Hawkins contends that sexual harassment has been going on at least since she began working at Somers in 1989. She specifically complained about the difficulty for women to obtain bathroom breaks. Additionally, she stated that one time a captain required her to pat down inmates, and the captain chose to require the inmates (approximately 35 to 40) to remove their pants to search for contraband. Hawkins filed an incident report about this situation but DOC did not consider it to be a problem.

**Major Guilbert, DOC employee**

Major Guilbert testified that the AAU "lacks the compassion, the sensitivity, the time-sensitive attention to the issues and, most importantly, unlike what I'm sure that the Commissioner's expectations are, the leadership to react to all of those." Tr. 107.

**Linda Baron, DOC employee**

Linda Baron has worked as a CO since May 1988. Someone took pictures of her posterior and placed them at the hall keeper's desk where staff and inmates alike could see; three times used condoms were placed on the windshield of her car; her shift commander called her a "f***in' b***h"; she has difficulty getting bathroom breaks when assigned to a dorm area; she has been assigned to supervise open showers; an inmate called her "f***ing c**t" in front of the whole block, but when she reported it to a lieutenant, he would not allow her to write an incident report for sexual misconduct; and the same lieutenant was on duty when an inmate masturbated in front of her, yet

34

the lieutenant again told her she could not report the incident. Tr. 119-121. She was under so much stress because of the shift commander's harassment that she took off the month of December using her own time. After her lack of success in reporting to the lieutenant, Baron spoke to the warden who told her that she had to go through the chain of command. She is afraid to file a complaint because she has been retaliated against so much already. If she complained to the captain, it would leak to the "good ol' boy network" and be broadcast throughout the facility. Tr. 123.

**Danielle Royka, DOC employee**

Danielle Royka testified that everyone had to review the brand new video about sexual harassment. During the first week of May at roll call, according to Royka, the first and second shift heard Deputy Warden Murdoch state that staff needed to be more sensitive to women during their time of the month because they are more emotional then, and have a tendency to make a bigger issue out of something that would not otherwise be an issue. She stated that he went on to say that because of women's sensitivity, DOC was making a bathroom available for the women and that he would have underwear in his office for the women should they request it. She added that this prompted comments from staff suggesting that they should put up a calendar and have everyone's name on it "so we'll know who is going to be sensitive and who will not be." Tr. 90. Royka considered these comments to be discriminatory and harassment.

### b.    Labor Committee Public Hearing on July 10, 2002[56]

**Thomas Sellas, Connecticut Correction Employees Union, AFSCME Local 1565**

Thomas Sellas testified about an incident that occurred at the New Haven Correctional Center on April 1, 2001, where three female officers were harassed by three of their supervisors. Even after the incident was reported, the women were still exposed to the perpetrators; DOC only took some action when a second incident involving one of the three women and one of the supervisors/perpetrators occurred.

Sellas cited another incident that occurred at the Radgowski Correctional Institution where six female officers were harassed by their supervisors. The investigation began two weeks ago with Acting AA Director Tracey Butler's arrival at

---

[56] The transcript of this proceeding may be found at http://prdbasis.cga.state.ct.us/BASIS/TSCHRHP/LIN1/CHR/DDD/2002LAB00710-R001000-TRN.HTM/2002LAB00710-R001000-TRNHTM.doc (last visited February 25, 2003).

the facility, announcing why she was there. While the women were being interviewed individually, one of the supervisors/perpetrators kept staring at them from an office across the hall, in an apparent attempt to intimidate them.

Sellas stated that the AAU has a pattern of discouraging victims from filing complaints, investigating cases improperly, and not protecting the victims from harassment. In some cases, the AAU even "stalled their investigations" by exceeding the filing deadline for CHRO complaints, "hoping to circumvent the victim's right to file with CHRO." Tr. 65. Although Commissioner Armstrong was working to organize a sexual harassment training program for staff, Sellas testified that he had serious concerns about the sincerity of Commissioner Armstrong to institute the needed changes.

Finally, he said that the women are always reminded that if DOC finds any of their statements to be inaccurate, accordingly they may be subject to discipline or even dismissal. This, Sellas emphasized, intimidates the victims.

**Catherine Osten, DOC employee**

Catherine Osten stated that she "watched women being assaulted, forced into relationships, and subjected to unwarranted attacks on their personal lives and reputations." Tr. 80. She also watched women being subjected to involuntary transfer or forced retirement. According to Osten, loyalty in DOC is determined by "how much you cover up, not how much you reveal as truthfulness," Tr. 80. and that the persons who are being protected with this conduct are the perpetrators, not the victims.

She sat in as a witness on the interview of Lt. Smith in the case involving Nancy Orr. When Smith said that Orr was obviously being attacked, this was not put into the report until she insisted. Osten opined that this conduct "shows lack of experience or training on the part of the investigators, or a substantial cover-up by these same investigators." Tr. 81. She strongly complained about Capt. Wayne Valade, who apparently had several complaints filed against him, including a complaint she filed, but he was never disciplined.

Sexual harassment is often not reported in DOC, because the victims know that other victims who complained were involuntarily transferred, demoted or completely isolated.

**Wendy Moher, Executive Director, Women's Center of Northeastern Connecticut**

Wendy Moher is "a survivor of sexual harassment from the DOC." Tr. 86. She worked at DOC for eight years. She was harassed by a lieutenant who has since been promoted to major. She submitted written testimony, as well as the written testimony of fourteen other women: Doreen Evans, Maggie Gomez, Nancy Orr, Patricia Katz, Neva Lloyd, Devijji Wilkins, Heather Lenninger, Rosetta Saucier, Heidi Polardi, Gwen Fuller Lynch, Paulette Hill Williams, Maureen Allen, Fernice Mcallister, and Cheryl Schreindorfer.

**Gail Burns-Smith, Executive Director, Connecticut Sexual Assault Crisis Services**

Gail Burns-Smith testified that sexual harassment can and does happen in many working environments, but that women in traditionally male-dominated occupations are more likely to be harassed. "Various studies show that about 60-70% of women" working in law enforcement experience sexual harassment, and that only a small percentage of these women report it. Tr. 93. This happens because of the "code of silence and the severe retaliation that occurs when women do report misconduct." Id.

Burns-Smith stated that even with the media spotlight shining on DOC as a result of the public meeting held the month before, women continue to bring forward new allegations of sexual harassment and retaliation. Burns-Smith stressed that "[s]exual harassment does not need to be a fact of life for women working" at DOC; DOC "can and must transform an environment where sexual harassment or retaliation are tolerated to one where there is a real zero tolerance policy." Tr. 94. "In addition to moving forward, there are past wrongs that must be addressed." Id. Employees whose rights have been violated must be redressed.

**Alice Pritchard, Executive Director, CT Women's Education and Legal Defense Fund**

Alice Pritchard said that every employer, whether private or public, "has the responsibility to address discrimination within its own agency." Tr. 109. For that reason, she was deeply concerned to hear that DOC has apparently "pushed off its responsibility to address sexual harassment to CHRO." Id. She said that CHRO should be a "second step, not a first step", Tr. 110, and that it is important for people not to put the entire onus on CHRO rather than on DOC. Pritchard suggested that the budget for CHRO might need to be looked at to determine whether or not it does, in fact, have enough resources to address its statutory responsibilities. When asked

by Rep. Fleischmann about CWEALF's resources and expertise to potentially serve as a third party ombudsman in the following months, she replied that they do have the expertise, but that a third party ombudsman role would be better exercised by PCSW because of its statutory responsibilities.

### Donald Kruk, DOC Affirmative Action Director

Donald Kruk stated that at a particular point in time the AAU had just two investigators to deal with 7,000 employees, and that for that reason, they had to prioritize the cases, going to the "crisis" ones first and to the other issues later. Tr. 113-114. In describing the AAU process for investigations, Kruk stated that complaints are categorized as informal or internal complaints, while the formal complaints are the ones filed with CHRO or EEOC. He explained that internally the complainants can try to resolve things "at the lowest possible level," while externally "you get into a much more formal process where you're actually taking sworn statements and going through the whole—it becomes a more formalized process." Tr. 116.

The AAU investigates and may mention how serious the particular offense was, but the AAU does not determine the penalty. HR makes a formal recommendation concerning penalty, and then "it goes up ... the chain of command." Tr. 117. Kruk stated the AAU stops investigating after a CHRO complaint is filed.

The investigators are the ones who formulate the questions directed to the complainants and alleged perpetrators. Investigators cannot force a person to testify. If a person refuses to cooperate, they report it up the chain of command, so that the person can be disciplined (generally a one or two day suspension without pay). Yet Kruk does not consider it a failure to cooperate when individuals identified as witnesses to the incident(s) state that they saw or heard nothing. Kruk indicated that there is a guideline for completion of investigations within 75 days from the filing of the complaint, but that the AAU does not track how long it actually takes to complete investigations.

### Danielle Locas, DOC employee

Danielle Locas recounted that despite having worked for a long time in a "male environment" (25 years in the military, and thirteen years at DOC), she has never had to tolerate so much sexual harassment as she did at DOC. She said that this happened because administrators at the facility are the people who were

administratively transferred during investigations of sexual harassment complaints, and that they were transferred without having received any discipline for their previous actions. Locus stated that they continued with their actions, "[o]nly now it was at a new facility with new staff, and now with new cases against them". Tr. 135. She complained about her removal and/or transfer from the cellblocks because she insisted on removing sheets hanging across the inmates' cells, to avoid wrongdoing in the cells, "such as hanging, rapes, stabbing, weapon makings and possible escape attempts." Id. She also protested about being written up for abandoning her post when she took a three to four minute break to go to the bathroom.

**Tanjorie Godwin (Written Testimony Read by Unidentified Speaker)**

Tanjorie Godwin testified that in May 1996, officer Michael Noon physically assaulted her—pushed and shoved her against a wall—after a verbal exchange that took place in front of several inmates. Noon made statements such as, "It's about time you did some f***ing work." "Bring it on bitch. Let's see what you got." "I wouldn't f**k you with his dick" (pointing to inmates in the area). Tr. 143. She submitted a report about the incident, but no one ever spoke with her about it.

One month later Noon was transferred to another facility, but a few weeks later returned to the facility adjacent to where Godwin worked. Godwin brought a copy of the report she had filed to the deputy warden at Noon's facility. Within days, Major Lee met with her, asked a few questions, and asked her if she could be "professional" and work with Noon. Tr. 144. Godwin was given the option of transferring but she protested because she was the victim. Notwithstanding her complaint, she was later required to cross train with Noon. Later she was informed that her report had never been filed with the administration. In response, her union representative wrote to Commissioner Armstrong about the complaint, but never received a response.

A short time later, DOC investigated Godwin because of a complaint lodged by Lt. McNair. Lt. McNair complained because Godwin, who was in charge of the property room, would not give him two inmate tee shirts, because they were on back order at the time. Two captains investigated and the result was a formal counseling.

In 2001, she attempted to file an incident report regarding Lt. McNair for commenting to an inmate that Godwin and another female employee were "white bitches." Tr. 145. Capt. Alderucci refused to accept the report. Maj. Kranjuak did take the report and stated, "It would not get swept under the rug". Id. Nevertheless,

39

no action has been taken on her report despite her repeated follow-up communications.

**Paulette Hill (Written Testimony, Read By An Unidentified Speaker)**

Paulette Hill said that throughout her career, she has been subjected to many instances of blatant sexual harassment by her co-workers and by one of her supervisors. Hill never reported it, however, for fear of retaliation. On many occasions she was told things like "you work in a prison, not an office building." "If you can't handle that, leave." "You need to grow a tougher skin and learn to let things roll off your back." Tr. 149. After years of hearing such comments, she decided to complain after being invited to join an escort service apparently organized by one of her supervisors, Dennis Dockery.

After filing a complaint, however, Dockery began to spread "vicious rumors, sexual in nature" to the inmates about her and two other female officers. Tr. 150. Hill reported this incident too, and provided the names of the inmates who had informed her about the spreading of the rumors. The supervisor investigating the case questioned the inmates one at a time and told them that she had named them all. She said that this placed her in a "very dangerous situation". Id. Hill was very upset and brought to tears over her situation. Consequently, she was transferred to work the perimeter post at the facility. After several months she was returned to inside duty, having been told that Dockery received a five-day suspension and a transfer. The transfer had not yet taken place, however, and Hill had to continue to endure Dockery's harassment and intimidation for weeks. He sat next to her during roll call, tailgated her on the way to work, and talked about her to inmates stating he had pictures and a video of him and Hill engaged in sex.

After complaining further about Dockery's continued presence in the facility, and the emotional stress, Hill took an unpaid medical leave. Eventually, Hill returned to work after Dockery was finally transferred. She remained in treatment for her emotional state. After her return, Hill learned that some nude photos claimed to be of Hill and another female employee were circulating around the facility. She attempted to retrieve the photograph but apparently it had been destroyed. Hill filed an incident report. As a result, she was shunned by her co-workers for reporting another officer.

### Denna Stanley, DOC employee

On December 28, 2001, Denna Stanley was appointed as a Disciplinary Report Investigator. As a result of her appointment, some officers started to harass her by taking some of her personal belongings from her desk, vandalizing her desk calendar, spreading a rumor that she was having an affair with her supervisor, and that she had gotten her appointment because she was sleeping with this particular supervisor.

Moreover, Stanley's office was directly across from an inmate who masturbated in front of her daily for approximately three weeks. Her supervisor refused to allow her to file a report, however, and would not move the inmate. She had to take several days off because of this.

### Sandy Gauron, DOC employee

Sandy Gauron announced that she works with "very few men and a lot of little boys", who write dirty notes on bathroom walls, who make dirty phone calls and hang up, and who tamper with equipment so that it does not work properly, putting her life in danger. Tr. 159-160. Ever since she spoke at the last meeting, she has been scrutinized. She detailed some of the harassing incidents that happened to her, and she said that she prays every day when she goes to work, so that she can come home safely.

Gauron asserts that she was told by the AAU that if she filed a complaint with CHRO, they would not investigate her complaint. She believes that civilian people should investigate the complaints since the AAU answers to DOC and to the commissioner.

### Pauline Green, DOC employee

Pauline Green is a correctional nurse hired in 1998. She took an eight-week leave for surgery, and that after she returned to work she was told her position had been given to another nurse. Green is African-American and the nurse who took over her position is Caucasian. She said she complained about it to her supervisor, who refused to discuss the issue with her. She then proceeded to the AAU, where she was told that "if [she] filed a complaint, the situation would only get worse." Tr. 163.

Montville against a male correctional medic. Ana Scott and she did a quick investigation, found the allegations to be true, and suspended and transferred the medic. This marked her because she took action against a male. That is why *her* firing sent a very strong message to female employees.

She does not believe that HR "is used the way it should be. It is not given the authority and power that it has by law." Tr. 202. "It should be separate and it should be a watchdog of the activities of the Department." Id. HR Officers are "accused of not being team players" when they follow the law. Tr. 203.

While attending a Commissioner's staff meeting, she heard Deputy Commissioner Tokarz say that "white inmates at Cheshire Correctional Facility could not get a fair shake because the entire hierarchy at Cheshire was Hispanic." Tr. 206. (The Deputy Commissioner of Operations was Hispanic.) Deputy Commissioner Coyle responded that the situation was the same at York because "the hierarchy was all women." Tr. 207. At that meeting, she voiced her objection to those statements. The following week the AAU and HR were removed from her supervision and assigned to Tokarz and Coyle—who had no experience in those areas. Investigations by the SD are problematic because individuals with no experience conduct them. She sent Commissioner Armstrong a memo about this, but he never responded.

While at DOC, whatever discipline she recommended was always reduced. She does not feel that DOC's administration has a clear understanding of what sexual harassment is.

**Michael Madden, DOC employee**

A captain at York CI, Michael Madden is married to Nancy Orr, one of the Plaintiffs in the federal action who had filed an AAU complaint assigned to Jordan for investigation. Madden testified:

> He did speak to me. He did tell me that my marriage could be in jeopardy, that financially these steps could be a burden. He offered—he tried to make a deal, talked to me about possibly my wife having a job in another area. I'm not part of the investigation. He told me—He told me I'm not part of the investigation. I will not be interviewed for the investigation. And he still spoke to me. He got up here [at CHRO's fact-finding hearing] and talked about confidentiality and not bringing people into this that don't belong in it. And I had nothing to do with the case and he chose to bring [sic] me.
>
> On top of that, I received a letter from Mr. Kruk, knowing that Mr. Jordan talked to me. So they're both in on it. They both knew that he talked to me and he shouldn't have. And they sent a letter to my home

61

> certified mail accusing me of not cooperating with the investigation, that they tried to get a hold of my wife through me...
> And on May 6, I put in a formal complaint about this. I just wanted to let you know that they talked to me September 25 about this, 142 days later. It took for Tracy [sic] Butler to take over the unit before they even investigated this. They can't find anything I've given them at this time.

Tr. 228, 229, 231.

**Vicki Arpin, DOC HR Director**

Vicki Arpin has been DOC's HR Director since April 1999, with DOC since August 1993, and a state employee since 1986. She supervises approximately 100 individuals. The AAU investigations are directed and managed by the AAU staff. The AAU Officers notify HR staff if they choose to have them as witnesses. At the end of the investigation, the AAU forwards the summary to Deputy Commissioner Coyle "who concurs or reassigns the case." Tr. 239. Kruk and Coyle "determine what cases will be forwarded to HR for potential disciplinary review." Id. HR then determines the appropriate "level of penalty" and if Coyle approves it, a Laudermill hearing is conducted. Tr. 240. Then the case is brought forward to the Disciplinary Review Board, which "concurs or disagrees with the Labor Relations recommendation." Tr. 241. The case is then referred to Arpin for a final HR recommendation and then routed to deputy commissioners and Armstrong.

The AD requires sexual harassment investigations to be conducted jointly by HR and the AAU, but "not all investigations are routed through HR." Tr. 243. She recalls that there was a 1997 training exercise where a male cadet placed a female cadet's hand on his genitals rather than on his chest. It does not surprise her that there was no discipline imposed because the allegations were not corroborated. She talked to Kruk about the necessity of making credibility determinations, but he was not supportive.

There have been complaints about pornographic posters placed in offices. A captain complained about an obscene picture of a man and a woman placed in his office and a note saying that his wife was next. During an investigation it was discovered that someone placed pornographic videos in that captain's office, and that some majors sent him sexually explicit e-mails. Ultimately, one of the majors who sent the e-mails was demoted. The major who placed pornographic videos received a written reprimand. The complainant was also disciplined.

- Victims were sometimes punished or threatened with discipline for failing to report the harassment on the date it occurred;[65]

- Sometimes DOC inappropriately conducted an independent investigation of the victim after she or he reported sexual harassment;

- The investigators do not routinely advise complainants of their legal rights to file a complaint with CHRO and/or EEOC;[66]

- Investigators do not routinely begin their investigations with an investigative plan;

- Investigators do not always report allegations which, if true, constitute criminal activity, pursuant to AD 1.10;[67]

- With rare exception, an internal investigation is initiated only after an employee completes an incident report—a form designed for uses other than complaining of discriminatory conduct;[68]

- DOC employs an eight-step review process to impose discipline once an employee has been found to have engaged in sexual harassment which leads to inordinate delays in imposing and sustaining meaningful discipline; and

- Sexual harassment is pervasive at DOC.

Throughout this process, DOC's senior staff and its investigators have attempted to downplay the seriousness of the charges of sexual harassment, especially when they testified at CHRO's fact-finding hearings. One particularly noteworthy example is DOC's response to a female CO's complaint related to an inmate who

---

[65] Some women were allegedly disciplined for failing to report incidents on the date of occurrence, apparently in violation of Administrative Directive (AD) 6.6, Section 10: "The Shift Commander shall ensure, whenever possible, that all reports are typed and completed the same day during which an incident occurred." See also testimony of Commissioner Armstrong at the Labor Committee's public meeting on June 3, 2002, Tr. 14. See Appendix A.
[66] Indeed, according to OLR Research Report 2002-R-0888: John Moran, "Sexual Harassment Complaints at the Department of Correction" (Hartford: OLR, November 15, 2002, 4), "In practice, victims often ask what else they can do or what happens if their complaint fails, and investigators then inform them of their options . . . ." At the October 10, 2002 fact-finding hearing, AA Investigators also testified that they do not always advise complainants of their rights. See Tr. 73-75 (Jordan), and Tr. 160-62 (Civitello).
[67] See Appendix F.
[68] Although DOC has an intake form attached to its AA Grievance Procedure, apparently it is nor used for sexual harassment complaints, based on CHRO's review of the files and the testimony of the witnesses.

70

masturbated in her presence. When questioned about his mischaracterization of the allegation in his investigation report, the investigator minimized the inmate's conduct as undressing and simulating washing himself. He also minimized the conduct of the victim's co-workers and supervisors, and completed a seriously flawed investigation. When DOC top-level staff testified, they also downplayed the seriousness of the allegations and minimized the conduct. Indeed, they suggested that encountering naked men and men masturbating was common in a prison setting.

Assuming *arguendo* that such encounters are common, that does not relieve DOC of the responsibility to attempt to reduce the number of such incidents and impose consequences for such behavior. Further, DOC's position ignores the factual allegations that suggest that an inmate *deliberately and repeatedly* got the female CO's attention for the purpose of ensuring that she observed him masturbate. That this was known by her co-workers and supervisors, and allowed to continue unabated is the problem, not an occasional accidental glimpse of a naked and/or masturbating inmate.

As noted earlier, CHRO staff visited DOC's administrative offices to review internal investigation files of sexual harassment. Following those visits, CHRO learned of a number of individuals who had filed internal complaints whose files were not made available for review during the visits. After several informal attempts to obtain those files, CHRO made a request pursuant to the Freedom of Information Act for those files, and DOC responded by providing a majority of those files on or about December 24, 2002. It came to CHRO's attention in the following ways that many files were missing:

- CHRO's staff compared the names on the files it reviewed with a document prepared by DOC personnel listing the names of the Complainants by year the complaint was filed.

- In its conversations with DOC staff after the fact-finding hearing, CHRO's staff learned of other names.

- Upon receipt of the material from DOC in December, CHRO staff discovered a chart in one of the files listing names, allegations, and dates of complaints filed from January through April 1998.

Although CHRO does *not* conclude from this that DOC has intentionally withheld information, DOC's sloppy record-keeping is highly problematic. Additionally, in many of the files reviewed, there is evidence that the accused had been

71

accused (and sometimes disciplined) in the past. There are no other investigation files (at least made available for our review) regarding the prior incidents. This further complicates and diminishes DOC's ability to keep track of individuals accused of sexual harassment.

Most of the investigations CHRO reviewed were inadequate. Some were more seriously flawed than others. For example:

- Affirmative Action Unit (AAU) staff misunderstood and/or misapplied the legal standards applicable to sexual harassment.

- DOC failed to adequately discipline individuals who were found to have engaged in conduct prohibited by DOC's sexual harassment policy.

- DOC sometimes punished or threatened to discipline the victim for failing to report the harassment on the date it occurred, and/or inappropriately conducted an independent investigation of the victim.

- DOC retaliated against victims for having reported sexual harassment.

- DOC inappropriately assigned sexual harassment complaints to unqualified investigators.

- DOC unacceptably delayed beginning and completing investigations.

The law places an affirmative duty on employers to investigate all sexual harassment complaints promptly and thoroughly. DOC has failed to meet this mandate. To the extent that DOC claims that the Connecticut Supreme Court's ruling in Brittell v. DOC, 247 Conn. 148 (1998) endorses the adequacy of its investigations, CHRO disagrees.[69] Indeed, although affirming the lower court's decision, the Court did not give blanket approval to DOC's investigatory process. The Court instead acknowledged that there were "certain infirmities in the [DOC's] investigation." Id. at 175. Moreover, the Court emphasized that determining whether an employer took effective steps to remedy discrimination depends on the facts in each case. Id. at 168-69.

It is interesting to note that in DOC's December 24, 2002 response to CHRO's FOI request only one employee was identified who, after complaining of sexual

---

[69] Brittell was an appeal after trial where the clearly erroneous standard of review was employed. Under this standard, the Connecticut Supreme Court was required to defer to the trial court's findings of fact unless there was no evidence in the record to support a factual conclusion of the trial court.

harassment, was disciplined for prior related conduct. Yet clearly Cap. JC fits this description, as does MA who was disciplined for calling her harasser a "wuss", and PK who was the victim of a retaliatory false complaint.[70]

CHRO also learned that there does not appear to be any internal mechanism or tracking system for investigators to use to determine whether an accused has been accused of sexual harassment in the past. Although Cordula testified about a log maintained by the AAU, one investigator testified that he relies on his knowledge of past offenses and a review of the accused's personnel file. In her memo to Commissioner Armstrong, Arpin wrote: "Cases are tracked by complainant with no tracking of the accused for review and subsequent allegations."[71] This impedes DOC's ability to identify serial sexual harassers.

Finally, it appears that DOC and the AAU is under the false impression that an allegation of sexual harassment must rise to the level of violation of federal and/or state law to result in discipline. This is not necessarily so. Just as an employer is authorized to discipline any employee for various infractions, an employer may discipline an employee for violating its sexual harassment *policy*. Indeed, DOC *does* discipline employees who have violated various ADs. DOC may discipline employees who violate its sexual harassment policy without violating the legal rights of the accused.[72] See e.g., North Carolina Department of Correction Unlawful Workplace Harassment and Professional Conduct Policy.[73]

---

[70] See § V. A.
[71] See Appendix A.
[72] Just as the conduct does not have to rise to the level of a violation of state or federal civil law, it should be even clearer that the conduct complained of does not have to rise to the level of a violation of criminal law to be punished by the sexual harassment prevention policy. Notwithstanding, in one incident where the state police concluded there was insufficient evidence to arrest the accused, the AAU Acting Director recommended closing the AAU investigation without conducting an independent investigation into the allegations of violations of AD 2.2.
[73] § I.B. "Whenever there is a failure to abide by acceptable personal conduct standards the Department may take action, including disciplinary action, **even if** the conduct at issue does not rise to the level of *illegal* discrimination or harassment under state and federal law." (emphasis in original) § I.C. "HOWEVER, the Department reminds all employees that engaging in any of the below listed activities may constitute unacceptable personal conduct without regard to whether it violates state or federal law, and the Department may take disciplinary action up to and including dismissal for engaging in it." (emphasis in original)

73

**4**

# AFFIDAVIT

STATE OF CONNECTICUT  )
                      ) ss: Glastonbury
COUNTY OF HARTFORD    )

I, Teresa Trainor, being duly sworn, depose and say:

1. I am over the age of eighteen and believe in the obligations of an oath.

2. I am a United States citizen and reside at Columbia, Connecticut 06237.

3. I have been employed as a CO for the Department of Corrections since 1994.

4. Sexual harassment has been pervasive at Department of Corrections since 1994.

5. While training to become a CO at the academy, Correctional Officer Carlone approached me and expressed a romantic interest in me. At the time, CO Carlone was assigned to Hartford Correctional Center (hereinafter HCC). Shortly thereafter, he was promoted to the rank of Lieutenant.

6. Upon graduation from the academy, I was assigned to HCC. A few months into my relationship with Carlone, Captain Davis called me into his office and informed me that dating Carlone was conduct unbecoming an officer. I received a formal counseling. Lieutenant Carlone was eventually promoted to Captain.

7. Between 1994 and 2001, Dennis Jalbert, a correctional officer assigned to HCC frequently engaged in offensive touching of me and other female CO's and suggested that we were performing oral sex on ranking officers.

8. Between 1994 and 2001, CO Marian Baker frequently attempted and succeeded in touching the intimate parts of my body in the control center, supply room, at roll call and on the units at HCC.

9. I tried to discourage his conduct by agreeing to swap shifts however, his offensive conduct continued and I remained afraid of him.

10. I used to ask Officer Walter King to be in the supply area whenever I knew that CO Baker was coming into my area.

11. I tried to report Baker's conduct on one occasion to Captain Todd Case, however, Case failed to resolve the matter and stated 'that's just Big Daddy's way' referring to Baker.

12. Between 1994 and 2001, CO James Waterman would frequently discuss his sordid, sexual encounters with a nurse who is employed at the Department of Corrections.

13. CO Waterman would frequently engage in offensive touching suggesting that he was wiping off seminal material from my facial region.

14. I did not report CO Jalbert's conduct because I was afraid for my personal safety. Furthermore, I did not believe that a written report would be investigated nor did I believe that he would be disciplined by the department. Moreover, I believed that if I filed a written report, its contents would be used for purposes other than investigation of the incident. Additionally, I was told by several correctional officers that if I caused trouble, officers would not respond to my call for help if I were being attacked by an inmate.

15. I did not report CO Baker for the same reasons.

16. I did file a written report concerning CO Waterman's conduct. However, CO Jalbert asked me to rescind the incident report, and he stated that if I did, he would talk to Waterman about his conduct. I refused to rescind the report.

17. Since I joined the department, there have been a number of different types of newsletters. Many of them have contained racially and sexually offensive commentary.

18. I once suggested to CO Michelle O'Keefe, who was accused in one of the newsletter of committing a sexual act, to report the newsletter to the Warden.

19. I have personal knowledge from a senior ranking officer at the Berginn Correctional Institution that the copy of the PRIDE AT WORK newsletter was faxed to Berginn prior to my transfer to there.

20. Another correctional officer, who at one time was assigned to Walker/MacDougall, told me that he saw a copy of the PRIDE AT WORK newsletter at that facility.

21. While at a training session at Maloney CI, a Cheshire CI correctional officer told me that he had received a copy of the PRIDE AT WORK newsletter at that facility.

22. The affect of the hostile environment has caused anxiety, fearfulness, sleeplessness, and loss of enjoyment of leisure activities.

I swear under the pains and penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_Teresa Trainor_
Teresa Trainor - Affiant

Subscribed and sworn to before
me this 25th day of March, 2004.

_Jeffrey C. Kestenband_
Jeffrey C. Kestenband
Commissioner of the Superior Court