UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **TERESA TRAINOR** | CIVIL NO.: 3:02CV1230(AWT) |
| VS. | |
| **STATE OF CONNECTICUT DEPARTMENT OF CORRECTIONS** | March 23, 2004 |

## LOCAL RULE 56(a)2 STATEMENT

Pursuant to Local Rule 56(a)2, Plaintiff admits or denies the following statements in the defendant's Local Rule 56(a)1 Statement. Also, pursuant to Local Rule 56(a)2 and 56(a)3, the plaintiff enumerates each genuine issue of material fact to be tried.

    1. The plaintiff, Teresa Trainor, has been employed as a correctional officer by the defendant State of Connecticut Department of Corrections since August 1994.

    **Admitted**

    2. From immediately after her academy training in 1994 through early October 2001, plaintiff worked at Hartford Correctional Center as a correctional officer.

    **Admitted**

    3. From February 2000 to June 2002, Peter Murphy was the warden of HCC. At that time, John Armstrong was the Commissioner of Correction.

    **Admitted**

    4. On or about October 4, 2001 plaintiff volunteered for and participated in a hostage training simulation. The training simulation was witnessed by an outside civilian, who reported it to the Connecticut State Police and the Hartford Police Department. The outside police departments responded to the report as though it was a real hostage situation.

    **Admitted**

5. Immediately after the October 4, 2001 simulation, plaintiff left HCC and shortly thereafter filed for workers' compensation for a back and shoulder injury. She remained out on workers' compensation for six (6) months.

**Denied as to second allegation. Trainor dep. 23-24**

6. On October 9, 2001, plaintiff requested a transfer to a different correctional facility. Plaintiff requested the transfer because of the simulation, not because of any of the allegations underlying this litigation. The transfer request was granted on October 24, 2001, and accepted by plaintiff on October 26, 2001. Thus, plaintiff never returned to work at HCC after the October 4, 2001 hostage training simulation. By approving the transfer request, DOC permitted plaintiff to bump other employees who had more time on the transfer list for that particular purpose.

**Denied as to fourth allegation. Trainor dep. 130. Admitted as to remaining allegations.**

7. On or about October 24, 2001, an underground newsletter was found in the correctional staff's dining area at HCC. This area is accessible to correctional staff with only limited supervised access by inmates. A true and accurate copy of the underground newsletter is attached as Exhibit 2.

**As to the first allegation, plaintiff lacks sufficient knowledge to admit or deny the allegations and leaves the defendant to its proof. Admitted as to the remaining allegations.**

8. The underground newsletter was specific to HCC and contained offensive and inappropriate racial and sexual statements regarding HCC captains, lieutenants and correctional officers, both men and women.

**Admitted**

9. When Warden Murphy was first appointed to HCC in early 2000, there had been two other underground newsletters at HCC, the first within a week of his arrival, and the second within a few weeks thereafter. At that time, Warden Murphy ordered all copies gathered and

shredded, and was unable to ascertain who had written, published or disseminated the underground newsletter.

**The plaintiff lacks sufficient knowledge to admit or deny the allegations and leaves the defendant to its proof.**

10. Compared to the 2000 underground newsletters, the October 2001 underground newsletter was remarkable for its even more extreme views and the virulence of its personal attacks.

**Admitted**

11. The October 2001 underground newsletter also contained an inappropriate paragraph about the plaintiff being out on workers' compensation.

**Admitted**

12. The underground newsletter was anonymously written. Plaintiff does not know who wrote it, and concedes that it is possible that the newsletter was written by a correctional officer. Plaintiff heard rumors about who wrote it but she has never shared those rumors with either DOC or the Commission on Human Rights and Opportunities.

**Admitted**

13. The Department of Correction management does not know who wrote the underground newsletter.

**Denied. Defendant's Exhibit 2.**

14. Plaintiff has no reason to believe that either Warden Murphy or Commissioner Armstrong had any role in the writing, publishing or dissemination of the underground newsletter.

**Denied. Trainor dep. 63-65.**

15. Warden Murphy had no role in the writing, publishing or dissemination of the underground newsletter.

**Denied. Trainor dep. 63-65.**

16. The plaintiff does not know how the underground newsletter was published or disseminated. She concedes that a correctional officer staff member could have brought the underground newsletter into the facility in their pocket or training folder.

**Admitted.**

17. DOC and Murphy do not know how the underground newsletter was published or disseminated. Warden Murphy assumes that a correctional staff member brought it into the facility in his or her pocket or lunch.

**The plaintiff lacks sufficient knowledge to admit or deny the allegations and leaves the defendant to its proof.**

18. In the third week of October 2001, the plaintiff received a copy of the underground newsletter at home. The envelope was handwritten; but the plaintiff threw the envelope away.

**Admitted as to first allegation. Denied as to remaining allegation. Trainor dep. 85-86.**

19. Plaintiff has no reason to believe that either Murphy or Armstrong had any role in mailing the underground newsletter to her house. Murphy did not send the underground newsletter to plaintiff, nor does he know who did.

**Admitted.**

20. Plaintiff did not contact or report to DOC anything about the underground newsletter until she filed her complaint with the Commission on Human Rights and Opportunities on or about December 6, 2001. The plaintiff's complaint was served on DOC at the very end of December 2001.

**Admitted.**

21. Shortly after the underground newsletter was found, the Commissioner of Correction, John Armstrong, was holding his monthly "Commissioner's Meeting", where all of the wardens, deputy commissioners and top administrative staff of the DOC would meet with and report to the Commissioner.

**Admitted.**

22. Warden Murphy brought the underground newsletter to the Commissioner's meeting. Upon seeing the underground newsletter, Commissioner Armstrong immediately brought it before the assembled group, denounced it and similar newsletters that periodically appeared at other facilities. Armstrong instructed the group to address the underground newsletter issue wherever it appeared, and informed them that he would contact and work with him to address the underground newsletter problem.

**The plaintiff lacks sufficient knowledge to admit or deny the allegations and leaves the defendant to its proof.**

23. The next weekday after the Commissioner's meeting, Warden Murphy attended roll call at HCC. During roll call, Murphy denounced the underground newsletter, and warned HCC correctional staff that whomever had written the underground newsletter would face employment consequences, and due to the offensive and inappropriate nature of the underground newsletter, there might be civil consequences as well. Murphy requested that anyone who had any facts regarding the underground newsletter to come forward with that information.

**The plaintiff lacks sufficient knowledge to admit or deny the allegations and leaves the defendant to its proof.**

24. Warden Murphy also directed his staff to gather any and all copies of the underground newsletter and to shred all copies.

**The plaintiff lacks sufficient knowledge to admit or deny the allegations and leaves the defendant to its proof.**

25. No one came forward with any information regarding the underground newsletter, and Warden Murphy was unable to ascertain who had written or disseminated the underground newsletter.

**The plaintiff lacks sufficient knowledge to admit or deny the allegations and leaves the defendant to its proof.**

26. This on October 30, 2001, Warden Murphy requested the Director of DOC's Central Intelligence Unit, James Huckabey, to investigate who wrote and disseminated the underground newsletter. A true and accurate copy of Warden Murphy's request is attached as Exhibit 3.

**Admitted**

27. The Central Intelligence Unit conducted its investigation in early 2001. A true and accurate copy of the unit's November 14, 2001 report, including a July 2002 addendum, is attached as Exhibit 4. The unit interviewed the captain and lieutenants on duty, as well as some correctional officers, but was unable to ascertain who wrote or distributed the underground newsletter.

**Denied.**

28. Commissioner Armstrong also wrote a letter to the union, condemning the contents of the letter and asking for the union's assistance in the matter. A true and accurate copy of the letter is attached as Exhibit 5.

**Admitted.**

29. The union never provided any information as to who was responsible for the anonymous newsletter.

**The plaintiff lacks sufficient knowledge to admit or deny the allegations and leaves the defendant to its proof.**

30. Plaintiff had no idea as to how DOC should eradicate underground newsletters.

**Denied.**

31. DOC has a widely published sexual harassment reporting policy and procedure. A true and accurate copy of the policy in effect at the time is attached.

**Admitted.**

32. From the time she was hired by DOC, plaintiff was aware of the DOC administrative directive on sexual harassment.

**Admitted.**

33. Plaintiff has received affirmative action and diversity training at DOC.

**Admitted.**

34. Plaintiff was aware there was an affirmative action office at DOC.

**Admitted.**

35. Plaintiff was aware that there was a process and procedure in place to make affirmative action complaints.

**Admitted.**

36. The DOC sexual harassment reporting policy permits a report of sexual harassment to be made to a supervisor, the Unit Administrator, the Affirmative Action Unit or the Commissioner. If a report regarding sexual harassment at HCC was made to either a supervisor or the Affirmative Action Unit, Warden Murphy would have been informed.

**Admitted as to the first allegation. The plaintiff lacks sufficient knowledge to admit or deny the second allegation and leaves the defendant to its proof.**

37. Warden Murphy never received a sexual harassment report regarding plaintiff or from plaintiff until she filed her complaint with the Commission on Human Rights and Opportunities in December 2001. The only incident report filed by the plaintiff in the fall of 201 concerned her application for workers' compensation benefits due to the October 4, 201 hostage simulation.

**The plaintiff lacks sufficient knowledge to admit or deny the forst allegation and leaves the defendant to its proof. Denied as to the second allegation. Trainor dep. 72-82.**

38. Plaintiff contends that one of her co-workers, Correctional Officer Marion Baker, approached her sometime in early 2001, and indicated that he wanted to insert his night stick into her vagina. She alleges that at some time before the night stick comment, Baker told her he wanted to know what it was like to sleep with a white girl.

**Admitted.**

48. Plaintiff never brought the incident with Waterman to anyone's attention.

**Denied.**

49. Since 2001, plaintiff has had no further contact with CO Waterman.

**Admitted.**

50. Plaintiff never made complaints about her supervisors. Her lawsuit is about her two co-workers and the underground newsletter.  **Admitted as to first allegation. Denied as to second allegation. Amended Complaint.**

The Plaintiff, Teresa Trainor

By: _____
Kevin A. Randolph
57 Pratt Street, Suite 813
Hartford, CT  06103
Tel No: (860) 522-7004
Federal Bar NO. ct15547


By: _____
William H. Paetzold
Moriarty, Paetzold & Babcock
140 Hebron Avenue, Suite 102
Glastonbury, CT  06033
Tel No: (860)657-1010
Federal Bar NO. ct10074
